UNITED STATES of America,
Plaintiff-Appellee,

v.

James L. BUTLER and F. Lee Hyden,
Defendants-Appellants.

Nos. 79–5046, 79–5047.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 11, 1979.

Decided March 26, 1980.

Ed M. Hurley, Memphis, Tenn., for defendants-appellants in No. 79–5046.

David E. Caywood, James T. Reed, Memphis, Tenn., for defendants-appellants in No. 79–5047.

W. J. Michael Cody, U. S. Atty., W. Hickman Ewing, Jr., Memphis, Tenn., for plaintiff-appellee.

Before ENGEL, KEITH and MERRITT, Circuit Judges.

KEITH, Circuit Judge.

Defendants-appellants F. Lee Hyden and James L. Butler appeal from a jury conviction of four counts of conspiracy and extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. Appellants were charged with one count of conspiring to violate the Hobbs Act, Title 18 United States Code § 371, and three counts each of violation of the substantive provisions of the Hobbs Act. The indictment alleged the occurrence of three specific instances in which appellants each knowingly and willfully affected interstate commerce by extortion, in that property was obtained from individuals whose consent was wrongfully induced under "color of official right" in violation of the Hobbs Act. The jury returned a verdict of guilty on all counts.[1] We affirm.

---

1. Hyden was sentenced to a period of three and one-half years imprisonment on each of the four counts with which he was charged, such sentences to run concurrently. Butler was sentenced to three years imprisonment on each of four counts, such sentences also to run concurrently.

## I.

Appellant F. Lee Hyden was one of three elected members of the Shelby County Tennessee Board of Commissioners, having been elected in 1966, and serving in the capacity of Commissioner of Roads, Bridges and the Penal Farm until January 1, 1976. James L. Butler was the Director of Public Works for Shelby County, appointed by the three-member Shelby County Board of Commissioners in 1972, and serving in this capacity until December 31, 1975. As Director of Public Works, Butler worked directly for, and was ultimately responsible to, Commissioner Hyden, with respect to the supervision of the day-to-day operations of the Department.

The conspiracy count of the indictment charged that appellants Hyden and Butler conspired to use their offices from at least as early as September, 1972 until January, 1976, to obtain money and other things of value from persons in Shelby County in exchange for their actions in advancing priorities for the construction and appropriation of monies for certain road projects in the County. The indictment charged specifically that appellants approached various land developers who were interested in having Shelby County construct roads to or through land which they intended to develop. Appellants would agree to advance the priorities on the construction of certain roads, or cause monies to be appropriated for the purchase of rights-of-way through property owned by the developers.

The indictment further charged that as a *"quid pro quo"* for having advanced the priorities on the construction of certain roads in Shelby County, appellant Hyden sought the guaranty of a certain developer, William Cary Whitehead, on loans which he (Hyden) sought to obtain from local banks.

Moreover, for certain road projects, Hyden and Butler were charged with causing monies to be appropriated by the Shelby County Quarterly Court[2] for the purchase of rights-of-way from the developers, with the understanding that certain of the monies disbursed for the purchase of the rights-of-way would be kicked back to them. The kickback was accomplished by instructing the developer who was to kick back the money to conceal the arrangement by transferring the money through designated conduits. Appellants would obtain the assistance of persons outside of Shelby County in concealing the kickbacks by negotiating sham transactions involving sales of equipment and real estate.[3]

The indictment then set forth 42 overt acts committed separately and/or in combination by appellants in furtherance of the alleged conspiracy.

After initial discovery motions and motions for production of documents, pursuant to Rule 12(d)(2) of the *Federal Rules of Criminal Procedure*, a jury was empaneled and the case proceeded to trial. The jury deliberated approximately four hours before returning to announce its verdict, finding appellants guilty of conspiracy to violate the Hobbs Act, and finding each guilty of three separate substantive counts of violations of the Hobbs Act. Hyden and Butler were sentenced to three and one-half years imprisonment, and three years imprisonment, respectively.

Each appellant filed a separate appeal from their conviction, alleging the following trial errors:

1) The evidence presented by the United States of conspiracy was insufficient to support a finding of conspiracy, and the district court erred in denying ap-

---

**2.** Shelby County Quarterly Court is the administrative agency whose responsibility it was to make final decisions on recommendations made to it by the County Commission.

**3.** Two other parties to this arrangement whereby monies and properties were transferred were William Cary Whitehead, Jr., and James Edwards Hockaday. Whitehead was a land developer in Shelby County, who did business

through several corporations, including Whitehead Properties, Inc. and Northhaven Development Company, Inc. Hockaday was an officer, owner, or principal in several Nashville corporations, including V & C, Inc., Right-of-Way, Inc., and Hockaday Equipment and Supply Company, Inc. which were involved in the sale of construction equipment moving contracts, and the buying and selling of property.

pellants' motion for severance and dismissal of count one (the conspiracy count).

2) Each appellant contends that his conviction under both the substantive and conspiracy counts of the indictment must be reversed because the district court, in the absence of evidence sufficient to prove the existence of a conspiracy, improperly allowed the joinder of unrelated crimes allegedly committed by the two co-defendants. Each appellant claims prejudice to his right to be presumed innocent by the trial court's refusal to grant their motions to sever the trial. Appellant Hyden claims particular prejudice to his right to be presumed innocent as a result of co-defendant Butler's admissions.

3) Appellant Butler claims error in the jury instructions concerning the requisite elements of proof for extortion "under color of official right", as proscribed by the Hobbs Act.

4) Appellant Butler claims additional error in the trial court's refusal to grant either a mistrial, or his motion for a new trial, premised on the government's conduct with respect to the introduction of an exhibit.

We find that the United States did present evidence sufficient for a jury to find a conspiracy between Hyden and Butler to violate the Hobbs Act. The trial court did not err in denying appellants' motions for severance and for dismissal of the conspiracy count. Moreover, in view of this court's recent holding in *United States v. Harding*, 563 F.2d 299 (6th Cir. 1977), we do not find the trial court's jury instructions on extortion sufficiently erroneous to constitute reversible error.

## II.

*Conspiracy to Violate the Hobbs Act*

Appellants Hyden and Butler contend that the United States at no time presented any proof that they conspired to extort from the government's chief witness, Whitehead. Appellants each admit that they had separate dealings with Whitehead, but deny acting together in furtherance of any conspiracy. Appellants submit that had the court granted their motions for dismissal as to the conspiracy count, then a severance would have been granted and each would have received a fair trial free of the taint resulting from the likely inference from that if one were proved guilty then the other must likewise be guilty.

In *United States v. Richardson*, 596 F.2d 157, 162 (6th Cir. 1978), this court cited with approval the necessary elements of conspiracy stated in *United States v. Williams*, 503 F.2d 50 (6th Cir. 1974):

In showing the existence of a conspiracy, two elements must be proven: an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy. 503 F.2d at 54.

Proof of the requisite knowledge and intent on the part of conspirators need not be made by direct evidence. Rather, circumstantial evidence or permissible inferences or deductions from facts are sufficient to make a showing of conspiracy. *United States v. Hearn*, 496 F.2d 236 (6th Cir. 1974) *cert. denied*, 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642 (1974); *United States v. Chambers*, 382 F.2d 910 (6th Cir. 1967). "It is the common design which is the essence of the conspiracy or combination; and this may be made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but always leading to the same unlawful result." *Poliafico v. United States*, 237 F.2d 97, 106 (6th Cir. 1956).

In determining whether the evidence presented in this case is sufficient to support the conviction under the conspiracy count, the evidence must be viewed in the light most favorable to the United States. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Our review of the record leads us to conclude that there is sufficient evidence from which a jury could properly infer the existence of a conspiracy between appellants Hyden and

utler to extort money and property from Whitehead.

Hyden and Butler worked closely with each other on the three road projects, Germantown Road Extended, North Watkins, and Holmes, whose favored treatment gave rise to their indictments. The United States produced no direct evidence of an explicit agreement between Hyden and Butler to work to advance the priorities of the three road projects. However, the government did introduce evidence that they each carried out their respective functions, each integral to the advancing of the priorities of Whitehead's projects, with the end result that in two cases Hyden received loan guarantees, and $100,000 in kickbacks, and in a third, Butler received $108,000 in money and real estate.

With respect to the advancement of the construction priority for Germantown Road Extended, the record shows that Whitehead was approached by Hyden seeking (Whitehead's) help in arranging a loan. In return for Whitehead's personal assistance in arranging the loan, Hyden offered to move up the priority of the Germantown Road Project. Whitehead agreed to the arrangement with the understanding that he would help Hyden arrange a loan only if the Shelby County Court first approved the advancement in priority of the Germantown Road Extended Project. Hyden then asked Whitehead to submit a letter to him in his official capacity as Commissioner stating a need for the immediate commencement of construction on the project, which letter provided a basis for raising the priority of the Project.

Whitehead complied and the letter was submitted on September 29, 1972. On October 4, 1972, at the request of Hyden, Butler submitted to the Shelby County Commission, in his capacity as Director of Public Works, a "resolution" requesting that funds be made available for the design and engineering of the Germantown Road Project.

The following day, the resolution was adopted by the Commission.[4] Four days later, on October 9, 1972, Butler then forwarded to Whitehead a copy of a general memorandum, published by the Commission, giving notice of its adoption of the resolution. Three days later, on October 12, 1972, Whitehead acted as personal guarantor for a loan in the sum of $10,000.00 from First America Bank to Hyden.

An additional resolution, which provided for the allocation of funds for the Project was adopted by the Shelby County Quarterly Court on October 30, 1972, notification of which was received by Hyden on November 2, 1972. That same day, Whitehead guaranteed another loan to Hyden in the amount of $60,000.00. At trial, Whitehead testified to having received a copy of this resolution from Hyden on November 2, 1972, prior to guaranteeing the loan to Hyden.

Moreover, Butler testified that the first that he knew about Germantown Road was when Commissioner Hyden called him up and summoned him down to Whitehead's office. At this meeting, according to Butler's testimony, Hyden said that "Mr. Whitehead would dedicate the twenty-one acres and that we should build the road and he did tell me to put the wheels in motion, and I did put the wheels in motion."

Q.: Mr. Hyden said, "We will build the road." Did you take that as an order from Mr. Hyden?

A.: I took it as instructions to me.

Q.: In other words, Mr. Hyden had the power to get the wheels in motion?

A.: The power to get the wheels in motion originated from resolutions or approval of resolutions by the county commission and the county court.

Q.: Yes, sir. But you testified, Mr. Butler, that Mr. Hyden told you to put the wheels in motion and that's what you did?

---

4. The United States adduced evidence that appellants would solicit letters from various interested individuals and groups within the community in support of the resolution. In addition, Hyden, by virtue of his position as Com-

missioner of Roads, was able to exert influence with respect to the acceptance or rejection of any given proposal by his fellow Commissioners.

A.: Yes, sir.

Q.: What did you do to get those wheels moving?

A.: I formed a resolution and presented it to the County Commission ordering the Engineering Department to begin immediate design and engineering on German Road Extended.

On the North Watkins Project, Whitehead testified that he was advised by either both Hyden and Butler, or by Butler alone, that the priority of the North Watkins Road Project could be advanced and that Whitehead could be paid for the right-of-way through his property, if Butler was given part of the proceeds. Whitehead agreed to this arrangement, then "wheels were put in motion" to move up the priority of the North Watkins Project, and to pay Whitehead $119,589.00 for a right-of-way through his property from which Butler was paid $16,000.[5] Whitehead testified that prior to this time he had been giving, or dedicating, rights-of-way to the county. Butler orchestrated the kickback of his proceeds by having the money flow through a complicated set of transfers from one of Whitehead's accounts to another and then to a V & C, Inc. account, ostensibly for the purchase of used equipment, for which Whitehead received a bill of sale to conceal the sham transaction.

On the Holmes Road Project, Hyden initially suggested the possibility of advancing the priority of the project during a conversation with Whitehead concerning the collection of a $100,000.00 debt allegedly owed him [Hyden] as a result of his actions in causing the advancement in priority of the Germantown Road Extended Project. Whitehead testified that when he refused to acknowledge the debt, Hyden suggested that the priority of the Holmes Road Project could be advanced, and Whitehead would be paid for a right-of-way through his property as in the North Watkins Project, if Whitehead would agree to pay Hyden the $100,000.00 from the proceeds of such a sale. Whitehead agreed to this arrangement, again with the understanding that the priority of the Holmes Road Project first be advanced. Again, the wheels were put into motion, and as with the Germantown Road and North Watkins Projects, construction of the Holmes Road Project was advanced in priority, and approximately $400,000.00 in funds was appropriated for the purchase of the right-of-way through Whitehead's property.

In return for their favors, Hyden received a loan guarantee from Whitehead for $29,000.00, as well as two checks totaling $96,000.00, payable to Hyden's cousin, W. W. Freeman, a conduit to Hyden. Butler admitted to receiving a check payable to V & C, Inc., for $20,000.00 of which he was the intended recipient. In addition, Whitehead conveyed eighteen lots with a total value of $72,000.00 from his Development Company to V & C, Inc., again which served merely as a conduit to Butler.

■ The probability, if not necessity, of appellants' working in concert to effectuate their respective ends of the illicit scheme with Whitehead is evident from the testimony of Whitehead, as well as that of Hyden and Butler. Although there is some dispute as to whether or not all three parties were present at each of the meetings in which the illicit arrangements were made, the law does not require that all conspirators be physically present at the moment agreement is reached. Agreement among conspirators may take place seriatim. However, in this case, the joint presence of Hyden and Butler at meetings with Whitehead testified to by Whitehead, provides a basis from which a jury may properly infer agreement among alleged conspirators from their subsequent overt acts.

And while agreement is an essential element of the crime of conspiracy, a jury may infer agreement from circumstantial evidence of the kind presented in this case.

---

**5.** To "put the wheels in motion," as in the Germantown Road Extended Project, a resolution was prepared by Butler to purchase a certain right-of-way, which resolution would then be submitted by Hyden, who, provided he accepted it, would in turn submit it to the three person Commission of which he was a member, and to the Quarterly Court for final approval.

The circumstantial evidence presented in this case established the close working relationship of appellants Hyden and Butler, the necessity for Hyden to approve the proposed action, and the necessity for Butler to prepare and submit the proposed action embodied in a "Resolution" to the full commission. In addition, there is Butler's testimony that Hyden instructed him to "put the wheels in motion." And finally, there is the inflow of money and property for the benefit of each appellant from the same source, immediately following the accomplishment of an act which required performance on each appellant's part.

Viewing the evidence in the light most favorable to the government, we hold that there is more than sufficient evidence to sustain appellants' convictions on the conspiracy count, and that the trial judge did not err in denying appellants' motions for acquittal and severance.

### III.

### Elements of Hobbs Act Violation

The next issue, raised by appellant Butler alone, is a more troubling one. Butler admits to having obtained from Whitehead money and other property not due his office as Director of Public Works. In addition, he concedes that the sole motivation underlying his receipt of these illicit payments was that he had the power, as Director of Public Works, to achieve the ends sought by Whitehead. Butler's defense centers on the requirement that the alleged extorter have "induced," or somehow initiated, the victim's illegal exchange of money for the official goods or services. Butler contends that he neither initiated or induced Whitehead's payments to him, nor was Whitehead under any form of compulsion to make such payments. Rather, Butler argues that he was the passive recipient of a bribe, which conduct is not proscribed by the Hobbs Act.

To determine whether Butler's conduct is cognizable under the statute, assuming *arguendo*, that his conduct consisted of the mere passive receipt of a bribe, we must look to the statute and its interpretation by the courts. 18 U.S.C. § 1951 provides as follows:

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

Assuming *arguendo*, that Butler's conduct consisted of the mere passive acceptance of a bribe, it is the position of the United States that such conduct, whether the solicitation of, or the mere acceptance of, illicit payments for the desired "official action", was a clear abuse of Butler's office, falling within the proscriptions of the Act. We agree. Butler's contention that a distinction under the Act is drawn between the voluntary payment of a bribe, and extortion, by way of the inducement or initiation of such payment, is a technical overdrawn distinction which is in keeping with neither the legislative intent of the statute, nor recent case law holding that in cases of misuse of official power, bribery and extortion are not mutually exclusive. *United States v. Harding*, 563 F.2d 299 (6th Cir. 1977), *United States v. Kahn*, 472 F.2d 272 (2nd Cir. 1973) *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973), *United*

*States v. Hall*, 536 F.2d 313 (10th Cir. 1976), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976), *United States v. Hathaway*, 534 F.2d 386 (1st Cir. 1976), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). As this court recently held in *United States v. Harding, supra*, a showing that the motivation for the payment focuses on the recipient's office, regardless of who induces the payments, is sufficient to convict under the Hobbs Act. *See also United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974) *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

In *United States v. Nardello*, 393 U.S. 286, 289, 89 S.Ct. 534, 536, 21 L.Ed.2d 487 (1969), Chief Justice Warren discussed the meaning of extortion in the Hobbs Act and stated:

> "At common law a public official who under color of office obtained the property of another not due either to the office or the official was guilty of extortion. In many States, however, the crime of extortion has been statutorily expanded to include acts by private individuals under which property is obtained by means of force, fear or threats."

This court adopted the broad construction of "extortion" under the Hobbs Act suggested by the Supreme Court in *Nardello* in *United States v. Harding*, 563 F.2d 299 (6th Cir. 1977), where we held that a Hobbs Act conviction is sustainable upon a finding that property was unlawfully obtained either under color of official right or through force or duress. The *Harding Court*, at 306, quoted the First Circuit in *United States v. Hathaway*, 534 F.2d 386 (1st Cir. 1976), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976):

> [W]e find no reason to part company with the other circuits which have considered this question, all of which have read the statute as did the court below. [citations omitted] The statute is clearly phrased . . . Further, a disjunctive reading comports with the historical development of the crime of extortion. The "under color of official right" language reflects the common law definition of extortion,

which could be committed only by a public official's corrupt taking of a fee under color of his office and did not require proof of threat, fear or duress. [citations omitted] The misuse of public office is said to supply the element of coercion. [citations omitted] Threats, fear and duress became express elements only when the crime was later broadened to include actions by private individuals, who had no official power to wield over their victims. The court went on to note that bribery and extortion as used in the Hobbs Act are not mutually exclusive. The Tenth Circuit made similar findings in *United States v. Hall*, 536 F.2d 313 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976).

This Court is satisfied that the disjunctive language of the statute, the legislative history, and the common law understanding of extortion support the interpretation of the other courts which have considered this matter.

On this analysis, the legal significance of the distinction between a public official accepting a bribe and a public official taking valuables under threat (common law extortion) is diminished. The "coercive" element on the part of the official, and the "duress" or "fear" element on the part of the "victim" are implied from the public official's position of authority over the victim.

Assuming the truth of the claims made by Butler in his defense, the fact situation in the instant case is somewhat unusual in that Whitehead testified to having made the payments of money and property willingly and voluntarily. Indeed, the party most under duress, *financial duress*, seemed to be Hyden; which Whitehead turned to his advantage, by offering to assist him financially in return for the favor of moving up the priority of his projects. The record does not disclose any duress on the part of Whitehead, in the sense that he faced economic loss in not having the priority moved up (although he was clearly in a better position to make a financial profit once his land was developed). However, even assuming no impending economic loss

on Whitehead's part, the court may find extortion in appellants' wrongful use of their power to gain personal financial reward. Moreover, there is some evidence in the record indicating that in each instance, Whitehead, was approached by appellants with this scheme.

■■ The difficult issue in this case is the trial court's jury instructions, which permitted the jury to find extortion without finding that Hyden and Butler had "initiated" or "induced" the illicit transfer of payment. A review of the record reveals that the trial court considered the distinction, and used its discretion in light of the recent Sixth Circuit opinions in *Harding* and *Shelton* [*U. S. v. Shelton*, 573 F.2d 917], to give the instruction that it did.[6] We find no abuse of discretion, in light of the above discussion. We are not unmindful of the prior law in other circuits holding that initiative and purpose on the part of the official, and fear and lack of voluntariness on the part of the victim, are essential to the distinction between bribery and extortion, only the latter of which is cognizable under the Hobbs Act. *See United States v. Hyde*, 448 F.2d 815 (5th Cir. 1971); *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1971); *United States v. Addonzio*, 451 F.2d 49 (3d Cir. 1971); *See also United States v. Adcock*, 558 F.2d 397 (8th Cir. 1977), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). In light of an almost unanimous holding by the circuits that bribery and extortion are not mutually exclusive, we hold that any wrongful use of a public official's power for private personal gain is proscribed by the Hobbs Act.

In *United States v. Harding*, 563 F.2d 299, 304 (6th Cir. 1977), we discussed the evolution of the meaning of "extortion" under the Hobbs Act, from its early bases in state statutory law and its early federal case law derivatives. In that discussion we

distinguished those interpretations of "extortion" which focused on the victim's state of mind as a basis for determining whether an offense committed under color of office was bribery or extortion, from the common law understanding of extortion. We held that in enacting the Hobbs Act, Congress adopted the common law understanding of extortion, which does not require this distinction between extortion and bribery:

> At common law, extortion was a crime which could only be committed by a public official. *Corpus Juris Secundum* states:
>
> [I]n the common law the term "extortion" has acquired a technical meaning, and designates a crime committed by an officer of the law who, under cover or color of his office, unlawfully and corruptly takes any money or thing of value that is not due to him, or more than is due, or before it is due. In a more enlarged sense, it signifies any oppression under color or pretense of right!

[*35 C.J.S. Extortion* 355–56] *Harding, supra* 563 F.2d at 304.

The *Harding* Court referred to a number of state and federal decisions holding that "extortion" covers a wide range of activity, including what is commonly understood as bribery, and that extortion and bribery are not mutually exclusive. In addition, we cited some courts which have defined extortion as "the wrongful taking of money by a public officer, whether accompanied by 'threats' or not." *State v. Begyn*, 34 N.J. 35, 167 A.2d 161 (1961). *See also State v. Newton*, 328 So.2d 110 (La.1976); *United States v. Hyde*, 448 F.2d 815 (5th Cir. 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972); *United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *United States v. Hathaway*, 534 F.2d 386 (1st Cir. 1976), *cert. de-*

---

**6.** The *Shelton* case we do not find apposite here, because although appellant's challenge to his conviction was that the victim's unwillingness had not been sufficiently demonstrated, the trial court's jury instructions in *Shelton* did include the charge that a finding of inducement was necessary—specifically excluding the pas-

sive acceptance of a bribe as grounds for conviction. Consequently the *Shelton* court did not have to consider whether a jury conviction under the Hobbs Act could be sustained in the absence of a charge to the effect that a finding of inducement is necessary.

*nied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). We then concluded that "[t]hus extortion defined as the wrongful obtaining of property under color of official right need not include the element of force or duress, and could include such activity as is commonly considered to be bribery." 563 F.2d at 305.

*See also United States v. Braasch,* 505 F.2d 139 (7th Cir. 1974), *cert. denied* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975), in which the Seventh Circuit stated that the crux of the statutory requirement of "under color of official right" is the wrongful use of one's office to obtain payments. The court held that "[i]t matters not whether the public official induces payments to perform his duties or not to perform his duties, or even, as here, to perform or not to perform acts unrelated to his duties which can only be undertaken because of his official position. So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951. That such conduct may also constitute "classic bribery" is not a relevant consideration." 505 F.2d at 151.

## IV.

### *Exhibit No. 79*

Appellant Butler cites as additional grounds for reversal of his conviction the trial court's failure to grant a mistrial when one of the government's witnesses gave testimony which was shown to be false by an exhibit (Exhibit 79) introduced by the government at the end of witness Hockaday's testimony. In addition, Butler contends that the trial court erred in not granting a mistrial where the government failed to provide requested documentary evidence pursuant to appellant's Rule 16 request for "written materials" and his motion for exculpatory evidence.

Exhibit No. 79 consists of two documents, a memorandum from the Shelby County Purchasing Agent to Butler which indicates that Hockaday bid on a bridge crane and dealt with a man named McWhirter in this transaction, and a letter from Butler to Hyden recommending the purchase of Hockaday's crane. Butler contends that Exhibit No. 79 reflects that the government presented false testimony from Hockaday which went uncorrected, and that the government failed to provide him discoverable documents pursuant to his Rule 16 request and his motion for exculpatory evidence.

In the conspiracy count of the indictment, the government charged Butler with providing Hockaday with favorable treatment in his contracts with the county. Butler contends that Hockaday falsely testified that Butler had allowed him to bypass county bidding procedures with respect to his award of a county contract for the lease of his crane, which testimony Exhibit No. 79 would have rebutted. Furthermore, Butler contends that the government's possession of the memorandum indicating that Hockaday had, in fact, bid on the bridge crane, when coupled with the government's knowledge that Hockaday was an admitted perjurer, and had received a grant of immunity from the prosecution, suggests that the government knew or should have known of the falsity of Hockaday's testimony and was remiss in allowing his testimony to go uncorrected.

▪ A review of the trial transcript reveals that Hockaday testified to remembering only possibly one instance in which he was directly able to bypass county bidding procedures:

Q.: Did you ever receive any business from the county that you got not on bid basis where you had to bid to get the work with other people?

A.: I don't believe we bid the rental of the crane—I believe that would be the only thing.

It is not insignificant that the one instance in which Hockaday was able to recollect bypassing the bidding procedure, was conclusively disputed by the memorandum in the exhibit indicating that Hockaday had in fact put in a bid on the bridge crane. However, subsequent testimony by Hockaday corrected the general impression given by

his erroneous statement. During the course of the same testimony, Hockaday stated that in a number of instances he submitted bids to the county only after "specifications" for bids had been put out by Butler based on particular types of equipment in Hockaday's possession. The Government's failure to correct the specific misimpression at the time made, particularly given its presentation by Hockaday as a tentative recollection, is harmless error, in light of all the evidence. Moreover, by introducing Exhibit 79 which reflected that in fact Hockaday had gone through the bidding procedure, the government was able to correct any mistaken impression apprehended by the jury with respect to the award of the crane rental to V & C, Inc., Hockaday's firm.

■ Appellant erroneously argues that the government was under an affirmative duty to correct Hockaday's mistaken testimony at the time it was given, and cites *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Wagster v. Overburg*, 560 F.2d 735 (6th Cir. 1977), in support of his position. However, *Agurs* held specifically that a prosecutor does not violate a constitutional duty of disclosure unless his omission is sufficiently significant to result in the denial of the defendants' right to a fair trial. And the mere possibility that an item of undisclosed information might have aided the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense. The proper standard of materiality of undisclosed evidence is that if the omitted evidence creates a reasonable doubt of guilt that did not otherwise exist, constitutional error has been committed.

On this record, it is clear that even had Exhibit No. 79 been turned over to defense counsel prior to trial so as to permit immediate correction of any mistaken testimony as to whether Hockaway in fact had followed the normal bidding procedures, it would not have been sufficient to create a reasonable doubt in the jury's mind as to Butler's guilt.

## V.

Accordingly, the judgment of the district court is affirmed.