UNITED STATES of America, Plaintiff,

v.

Gilbert NELSON, James V. Gassaro, Joseph Perrone and George Shamy, Defendants.

Crim. A. No. 87-41.

United States District Court,
D. New Jersey,
Criminal Division.

Nov. 5, 1987.

Samuel A. Alito, Jr., U.S. Atty. by Cathy Fleming, Stuart J. Rabner, Asst. U.S. Attys., for plaintiff.

Michael Querques, Orange, N.J., for defendant Nelson.

Andrew K. Ruotolo, Jr., Westfield, N.J., for defendant Gassaro.

Michael D'Alessio, Jr., West Orange, N.J., for defendant Perrone.

Dino D. Bliablias, Livingston, N.J., for defendant Shamy.

## OPINION

BARRY, District Judge.

Extensive press coverage, trumpeting charges of "extortion", followed the arrest and subsequent indictment of Gilbert Nelson, City Attorney for the City of New Brunswick, and James V. Gassaro, Director of Police. In that indictment, on which defendants were found guilty on June 11, 1987 on all counts,[1] defendants Nelson and Gassaro were charged with conspiracy to commit mail fraud (Count 1) and conspiracy to violate and a substantive violation of the Hobbs Act, 18 U.S.C. § 1951 (Counts 2 and 3). Nelson was also charged with and convicted on two counts of obstruction of justice (Counts 5 and 6), defendant George Shamy with one count of obstruction of justice (Count 5), and Nelson and Shamy together with conspiracy to obstruct justice (Count 4).

Following the return of the verdict, I dismissed the Hobbs Act counts.[2] There is,

---

1. Defendant Joseph Perrone's Fed.R.Crim.P. 29 motion was granted on all counts at the close of the government's case. Following the decision of the Supreme Court of the United States in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the government consented to the granting of a new trial to defendants Nelson and Gassaro on Count 1. By order filed October 30, 1987, Count 1 was dismissed without prejudice.

2. I reserved on defendants' motions for judgments of acquittal on those counts both at the close of the evidence offered by the government and at the close of all of the evidence. Fed.R. Crim.P. 29(b) does not provide for reserving decision on a motion at the close of the government's case. I advised the parties, however, that I needed further time for reflection on the motions addressed to the Hobbs Act and no objection was voiced (T. 1508).

in my judgment, uncertainty in the Third Circuit as to a major issue of criminal law, i.e. whether, under the color of official right prong of the Hobbs Act, the prosecution must prove that a public official used the power of his office to induce payments not due him or his office. I determined that resolution of this apparent uncertainty should not be decided on a Fed.R.Crim.P. 29 motion because to do so would deny the government any opportunity to obtain review of my decision. I note that as defendants are entitled to justice in this court, so, too, is the government and, by virtue of the timing of my action, the government has the right of appeal. If the Court of Appeals resolves the uncertainty I see in favor of the government, the convictions on the Hobbs Act counts can be reinstated.

## I. *The Hobbs Act "proofs"*

The government's proofs as arguably relevant to the Hobbs Act counts give new meaning to the word "meager". Richard Malouf, the purported victim yet the driving force behind the Count 1 scheme to defraud the City of New Brunswick, held an option to purchase and a right of first refusal on any offer made to purchase the property he leased from DeAngelis Buick in the City of New Brunswick. When, on November 17, 1982, an offer to purchase the property was made by one Antonio Zappia, Malouf was requested to exercise his right of first refusal within 30 days if he so desired.

In December 1982, Malouf contacted Nelson, a friend of thirty years, and thereafter met with Nelson and Gassaro, another life long friend. Malouf told them that he thought the property would be an excellent location for a City maintenance and repair garage and asked Nelson to ascertain whether the City would be interested. Nelson himself thought it was a good idea because the City had been looking for a location for just such a facility.

> Malouf: I ... turned to Mr. Gassaro and asked him if he would be interested in going partners with me on this piece of property, because I was—I had just relocated to the highway and didn't have a lot of extra money to tie up in this piece of property. And I said to him that I thought it would be a good investment even if the City didn't buy it, because of the location and the renovations going on in the City, that it would be a good investment for us.
>
> Q. Why did you ask Mr. Gassaro to become your partner?
>
> A. Well, Jim and I have been friends a long time, many years, and over the course of the years when we'd bump into each other we would talk about things and once in a while we'd discuss maybe going partners on a project or something for an investment, an office building or something. And I just thought that this was a nice piece of property and it would, you know, being we knew the City, we knew the area, it would be a good investment. And, you know, in my mind I thought it would—it wouldn't hurt to have Jim as a partner.
>
> Q. And why in your mind did you think it wouldn't hurt to have Jim as your partner?
>
> A. Well, because I thought maybe if—if the City would consider it, that he might give a little support for it.
>
> Q. Now, did you discuss that explicitly, what you had in your mind with Mr. Gassaro?
>
> A. No, I didn't.
>
> Q. That you thought his position would help?
>
> A. No, I did not.
>
> Q. It was in your mind?
>
> A. Yes.

(Transcript p. 137 at line 6 to p. 138 at line 9.)

Malouf offered the investment to Gassaro and Gassaro accepted. Malouf told him that they would split whatever profit was realized from the sale of the property and Nelson agreed to check with the City to see whether there was any interest. Nelson did not call Malouf with this information, however, and finally Malouf called him, learning that, indeed, there was some interest.

Encouraged by this news, in January 1983, Malouf reached an agreement with DeAngelis Buick that he would purchase

the property for $260,000. Malouf called Gassaro and told him he needed money for a deposit and Gassaro brought him $25,000 he had obtained from Joseph Perrone, his father-in-law. Gassaro was told that Malouf would need the balance of the money before the closing on March 1, 1983 and, before that date, Gassaro and Malouf went to the People's National Bank where each borrowed $20,000 which Malouf then paid at the closing. Gassaro, a purported extorter, thus put his own money into the silent partnership and, together with his father-in-law, put more money in than did the purported victim.

Malouf was disturbed to read articles in the press suggesting that he would realize a windfall profit if the property was sold to the City at an asking price of $330,000 given the price at which Malouf had purchased the property. He again called Nelson, with whom he had not spoken for months, and was told by Nelson that he did not think the City would buy it at that price. Nelson suggested, however, that Malouf attend the next City Council meeting and talk to the Council members. Malouf attended that meeting, made his "sales pitch", and the Council offered to purchase the property for $305,000.

Malouf called Gassaro and asked him whether he wished to sell the property or "sit on it". Gassaro said it made no difference to him and left the decision to Malouf, who accepted the offer. When he advised Gassaro of his decision, Gassaro, who shared office space with Nelson and had been loaning him money for some time, observed "Well, if I sell, Gil will probably put the bite on me for something." (T. 159).[3]

The contract of sale was signed on March 16, 1983 and the closing was held on May 5, 1983 with Nelson, as City Attorney, representing the City. Nelson deposited the $305,000 purchase price into his trust account and drew checks on that account in various amounts, including a check in the amount of $91,695.56 to Malouf. According to the closing statement, $96,695.56 was paid to Malouf and $1,067.50 was paid as a realty transfer fee. The $1,067.50, however, was not owed as the transaction was exempt from the realty transfer fee and was not paid. According to Malouf, he was shorted these monies by Nelson, who had never asked or been asked to participate in the investment. Malouf did not learn of the shortage until two years later, after the investigation which culminated in this indictment had commenced, when he compared the closing statement to the checks.[4]

The day after the closing, Malouf went to the office Nelson and Gassaro shared for the purpose of paying Gassaro and/or Perrone $25,000 of the profit. In Gassaro's absence, Nelson told Malouf to make the $25,000 check payable to "Tops Paving Co., Inc.". Malouf did so, and Nelson endorsed the check and deposited it into his trust account. It is clear that, unbeknownst to Malouf, Gassaro and Perrone received substantially less than the $25,000 Malouf expected they would receive. At no time before this investigation commenced was Malouf aware that, in the government's word, he had been "cheated" once again by Nelson. (*See*, e.g. T. 15, 18). Moreover, the portion of the Tops Paving check which Nelson took for himself dimin-

---

**3.** The evidence discussed was furnished exclusively by Malouf testifying under a grant of immunity. The government provided no other evidence as to these matters. Thus, for sufficiency purposes, I must accept Malouf's testimony. If I were to reject it, the government would have no explanation whatsoever as to why Malouf became involved with Nelson and Gassaro in the sale of the property. Cf. *United States v. Belgrave*, 484 F.2d 915 (3d Cir.1973).

**4.** Accepting Malouf's testimony (and there is no other evidence), Nelson did not obtain the $6,067.50 with Malouf's consent and, therefore, his conduct, while it might well be deemed to

constitute theft by unlawful taking or disposition, see N.J.S.A. 2C:20–3, or something akin thereto, cannot constitute extortion under color of official right, as will be explained. And, I note, although irrelevant to the Hobbs Act counts, $2,535.76 for water, sewage and taxes which Nelson deducted from the proceeds of the sale for transmittal to the City of New Brunswick was not, in fact, paid to the City until after the investigation commenced, with Nelson causing the City's records to be changed to reflect that that amount had been paid almost two years earlier.

ished the profit which Gassaro and Perrone would have received, not Malouf, and any scheme Nelson had going vis-a-vis those men or the City of New Brunswick was not charged with reference to the Hobbs Act counts.

Malouf and Gassaro consciously sought to deceive the City of New Brunswick as to the fact that Gassaro was a silent partner in the transaction which resulted in the City's payment of $305,000 for a piece of property which Malouf had purchased two months earlier for $260,000. Nelson's true role in this transaction is somewhat less clear. If one credits Malouf's testimony, Nelson defrauded not only the City of New Brunswick, which he was representing in this transaction, but his friends, Malouf and Gassaro, as well. On any view of the objective facts, Nelson's conduct was reprehensible but, in my view, neither his conduct nor that of Gassaro constituted extortion under color of official right.

## II. *The Uncertain Law*

■ The Hobbs Act, which has become an important weapon in the attack on official corruption, proscribes extortion affecting interstate commerce.

> The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. 18 U.S.C. § 1951(b)(2).

The Act is disjunctive and a violation "may be made out by showing that a public official through the wrongful use of office obtains property not due him or his office, even though his acts are not accompanied by the use of 'force, violence or fear'". *United States v. Mazzei*, 521 F.2d 639, 645 (3d Cir.) (en banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). This case went to the jury solely on that prong of the Act that charges "color of official right."[5]

*United States v. Jannotti*, 673 F.2d 578 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), the Third Circuit's latest word on color of official right and the case which has prompted the apparent uncertainty, states that the Hobbs Act "proscribes the 'obtaining of property from another ... under color of official right,' without proof of coercion by the defendant". 673 F.2d at 594, quoting *United States v. Kenny*, 462 F.2d 1205, 1229 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 234, 34 L.Ed.2d 176 (1972) and citing *Mazzei*, 521 F.2d at 643. Clearly referring to *Kenny* and *Mazzei*, *Jannotti* notes the "suggestion [in our cases] that there need be no inducement or prior request for such payments...." 673 F.2d at 595.

That "suggestion" has prompted uncertainty and, thus confusion. *Kenny* and *Mazzei* suggest, at least to me, that if the Third Circuit were required to rule, it would hold that inducement is, in fact, required in this circuit, the "suggestion" in *Jannotti* notwithstanding. In *Kenny*, the first successful Hobbs Act prosecution for extortion under color of official right, the court approved a jury instruction that payment could be "induced either by" fear or under color of official right. 462 F.2d at 1229. Indeed, when one replaces the ellipses used in *Jannotti* in quoting the above passage from *Kenny* with the words of *Kenny* itself, one finds a recitation of that very jury instruction, i.e. extortion is the "obtaining of property from another with his consent induced either by wrongful use of fear or under color of official right". *Id.* And in *Mazzei*, the word "induced" was treated as a requirement of the color of official right prong of the Act: "[W]e conclude that consent to the payments was 'induced ... under color of official right....'" 521 F.2d at 645. Extortion under color of official right occurred "so long as [the jury] found that [the extorted party] held, *and defendant exploited*, a

---

**5.** Count 2, the Hobbs Act conspiracy count, charged extortion both under color of official right and by virtue of "the wrongful use of fear of financial and economic injury to Richard Malouf...." (Ct. 2, § 4). At the close of the government's case, when pressed by the court for any evidence of fear of economic loss, the government conceded "there is none" (T. 1447) and that it was proceeding, with reference to Counts 2 and 3, solely on color of official right.

reasonable belief that ... the power in fact of defendant's office included "effective authority...." 521 F.2d at 643 (emphasis supplied).

While a reading of *Kenny* and its Third Circuit progeny leaves little doubt that, although the concept of inducement is not developed in any detail, inducement under color of official right is required, no Third Circuit case of which this court is aware has necessitated an explicit ruling or offered a clear directive for in each of those cases, without exception, there has been ample evidence of inducement or some conduct akin thereto. The suggestion in *Jannotti* that there is no such requirement, a suggestion not explained, is, of course, neither a ruling or nor an extension of Third Circuit law as *Jannotti* emphasized the powerful evidence in that case of inducing activity, thus pointing in two different directions.

The tension between what *Kenny* and *Mazzei* appear to require and the suggestion to the contrary in *Jannotti*, a case in which the record literally reeks of inducement, is not easily susceptible of resolution and perhaps explains the government's floating Hobbs Act theory which finally came to rest when it concluded that the suggestion in *Jannotti* should be followed. The government's definition of official right, as articulated in its opening statement, was "nothing more than [giving] money to someone simply because they [hold] an office." (T. 7). Almost immediately, the theory shifted: "Nothing more than ... defendants ... getting money and property interests, in this case silent partnership interests, in a piece of property by virtue of the fact that they were in a position to use their city office to make a deal happen" (T. 7–8). A further shift: color of official right became "a hope that they will do something ... using their public offices ... which would involve the misuse of office" (T. 1474). And while early on the payment of money had to be "induced under color of official right" (T. 7), the subject as well of one of the government's requests to charge, that theory was later withdrawn in light of the "suggestion" in *Jannotti*.[6]

The bare majority of federal courts of appeals that have discussed this issue hold that all a public official need do for there to be a violation of the Act is to receive payments not due him under the law, and that no act of inducement need be committed.[7] In the view of these courts, of which the Third Circuit is popularly believed to be one, the fact of the official's position and authority in and of themselves exert a coercive force on one making the payment.

The Second and Ninth Circuits, consistent, at least to me, with established precedent in this circuit, clearly require inducement or demand under color of official right. In persuasive and well reasoned decisions, those courts focus on the plain language of the Act itself and the bizarre results which can obtain if inducement is read to refer to everything in the statute *but* color of official right.

The Second Circuit in *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (en banc), examined the definition of extortion under the Hobbs Act. Necessary for a conviction under color of official right is proof that the public official induced the payments, i.e. evidence sufficient to permit "the jury to find that the public official did something, under color of his office, to cause the giving of benefits"—"[some] misuse[ ] [of] office to obtain benefits...." *Id.* at 693. The court recognized that, as long as his act creates the impression that payments are expected, inducement can be

---

**6.** This case went to the jury in accordance with the government's request, and over defense objection, pursuant to *Jannotti*'s suggestion that inducement is not required. There was utterly no evidence of inducement here unlike the cases of which this court is aware.

**7.** *See United States v. Swift*, 732 F.2d 878 (11th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985); *United States v.* *Hedman*, 630 F.2d 1184 (7th Cir.1980), *cert. denied* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981) and *United States v. Butler*, 618 F.2d 411 (6th Cir.), *cert. denied* 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980). The First Circuit has explicitly reserved decision on the issue. *United States v. Jarabek*, 726 F.2d 889, 904 n. 16 (1st Cir.1984).

subtle: "Proof of a request, demand or solicitation, no matter how subtle, will establish wrongful use of public office; proof of a *quid pro quo* would suffice as would other circumstantial evidence tending to show that the public official induced the benefits." *Id.* at 691–92. The extortion must "begin[ ] with the public official, not with the gratuitous actions of another" and "when a public official merely accepts unsolicited benefits knowing that they were given because of his public office", it is not extortion. *Id.* at 684, 691. Absent inducement, observed the *O'Grady* court, public officials would neither be protected from an overbroad statute nor an impermissible degree of prosecutorial discretion and the Hobbs Act would be transformed into a professional ethics standard governing public officials. 742 F.2d at 687.

The Ninth Circuit, in *United States v. Aguon*, 813 F.2d 1413 (9th Cir.1987), while not in so many words parting with that circuit's construction of the Hobbs Act as to require inducement, *see United States v. McClelland*, 731 F.2d 1438, 1440 (9th Cir. 1984), *cert. denied*, 472 U.S. 1010, 105 S.Ct. 2708, 86 L.Ed.2d 723 (1985), required a demand on the grounds of office for an act to be under color of official right. While "[n]o threat and no specific inducement need be made ... a demand (which some people might think to be a form of inducement) is necessary." [8] 813 F.2d at 1416. "However subtly the official communicated, a demand was ... necessary to constitute common law extortion," and Congress has not indicated any intention to eliminate that common law requirement. *Id.* While noting differences between its conclusion and some language in *O'Grady*, most notably the *O'Grady* court's understanding of "inducement", the *Aguon* court concluded that it was in harmony with *O'Grady* on the main points, most particularly that the jury must find "that the public official did something, under color of his office, to cause the giving of benefits." *Id.* at 1418, quoting *O'Grady*, 742 F.2d at 693.

Without pausing to analyze why the language of the Hobbs Act and the common law dictate that inducement or demand should be the anchor of color of official right, it is clear that without that anchor, official right goes out to sea, bizarre results obtain, and uncertainty again rears its head. For example, the Third Circuit has approved a jury instruction that extortion under "[c]olor of official right is defined as the taking by a public official of money not due him or his office...." *United States v. Cerilli*, 603 F.2d 415, 427 n. 2 (3d Cir.1979) (Aldisert, J., dissenting), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980). *See Jannotti*, 673 F.2d at 595. This expansive language, absent an inducement requirement or stripped from its moorings in a case in which there was "overwhelming" proof of coercion, 603 F.2d at 425, would cover even a gift where no *quid pro quo* was either sought or believed to be possible because a gift is not "*due* him or his office" (emphasis supplied). It would cover any pocketing of money by a public official as by larceny or embezzlement committed surreptitiously.

But it would defy logic to penalize the mere receipt of a gratuity, effectively a lesser included offense of bribery, the same as the greater offense. *Cerilli* notes that "The receipt of money ... is not inherently wrongful." 603 F.2d at 419–20. And certainly more than a gift or a mere taking is required if the foundation of the Hobbs Act in the Anti–Racketeering Act of 1934 and the New York Criminal Code as construed by the New York courts in 1946, when the Hobbs Act became effective, is not to be ignored. *See United States v. Agnes*, 753 F.2d 293, 297 (3d Cir.1985).

Certainly, too, more than a gift or a mere taking is required if state and local officials are not to face penalties potentially ten times greater than federal officials, under federal law, for identical conduct. *See* 18 U.S.C. § 201(g) (federal official who receives money "for or because of any official act performed or to be performed" is

---

**8.** This somewhat tortured construction was presumably dictated by the *Aguon* panel's success-

ful attempt to avoid *en banc* consideration of the issue.

subject to imprisonment for two years).[9] I, for one, will not attribute such an intent to Congress. Rather, with Hobbs already on the books, the enactment of the "anti-gratuity" statute in 1962 was "a clear indication that Congress did not believe that the Hobbs Act prohibits such conduct." *O'Grady,* 742 F.2d at 691. Beyond that, of course, the enactment of that statute, which eliminates common law concepts, is a clear message that Congress did not intend to eliminate the common law core when in the Hobbs Act it employed the common law phrase "under color of official right". *See Aguon,* 813 F.2d at 1417. And so there is uncertainty and, indeed, confusion when one sees color of official right defined, without more, as a taking of money not due the public official or his office. What the "more" is, absent inducement or something akin thereto, is not entirely clear.

*Mazzei* teaches that there must be a showing that a public official "through the wrongful use of office obtains property not due him or his office...." 521 F.2d at 645. But how is one's office "wrongfully used"? Certainly, wrongful use of office means more than the mere receipt of money not due the official or his office, although the receipt of money is, of course, a necessary element of the crime. The phrase "wrongful use"—and the word "obtain"—implies an action component and a defendant has to use his office to obtain money.[10] Certainly, too, the facts of those cases which speak in terms of "wrongful use of office" describe conduct from which inducement is readily inferred. The wrong under the Hobbs Act, after all, is the manner in which that money is obtained and the defendant must, in some manner, use his employment to extort. *Cerilli,* 603 F.2d at 419–20 and n. 6.

What becomes fairly clear from a close reading of the cases is that whether it is called "inducement", "exploitation", "use of office", "demand", "coercion" (explicit or implicit), or whatever, there must be a causation component for there to be extortion, i.e. something done by an official which causes one to knowingly part with money or property. It also becomes fairly clear that the disagreement among courts as to the parameters of what "something" is required is more apparent than real.

Even if passive acceptance of a bribe—an "unexpected bribe", as *Jannotti* describes it—would constitute a violation of the Hobbs Act, a conclusion which the cases before the Third Circuit have not required it to draw, *see Jannotti,* 673 F.2d at 595, implicit in accepting a bribe is an understanding that certain action or inaction is sought in exchange for payment with the receipt of payment effectively compliance with a demand. A bribe by definition comprehends the payment of money based on a belief on the part of the payor that payment is the *quid pro quo* for the taking or withholding of official action, a belief which is exploited or subtly induced by the payee upon acceptance of payment with knowledge of the reason therefor. As Judge Easterbrook put it, "The prosecutor needed to show that [the 'victim'] paid because Murphy was willing to alter his official acts". *United States v. Murphy,* 768 F.2d 1518, 1535 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986).

Stated somewhat differently, the public official even in the bribe situation must obtain property knowing that it is consideration for the exercise of his official duty. So viewed, of course, bribery and extortion are not mutually exclusive because it is of no matter whether the "victim" is willing or unwilling and of no matter that the purported "victim" himself instigated the corrupt opportunity.[11]

---

**9.** The Hobbs Act provides penalties of up to twenty years incarceration and a $10,000 fine. 18 U.S.C. § 1951(a).

**10.** In the Hobbs Act, Congress used the word "obtaining" in the sentence preceding the definition of extortion to define robbery—"the unlawful taking or *obtaining* of personal property" against another's will (emphasis supplied). If Congress meant the words "taking or obtaining" to include passive acceptance of property, it would not have used those words to define the active offense of robbery.

**11.** It appears that the United States Sentencing Commission views extortion under color of official right as mandating what has been traditionally thought of as an extortionate act—an in-

There was no evidence that either official used his office to extort money from Malouf. Nelson, who committed a crime akin to embezzlement, obtained no money from Malouf with Malouf's consent. By definition, therefore, his conduct did not constitute "extortion". Gassaro had no intention of obtaining money from Malouf but, rather, Malouf and Gassaro together intended to obtain money from the City of New Brunswick[12]. While this conduct did not constitute extortion, it was the underpinning of the government's theory on the mail fraud count—a scheme to defraud the City—a theory, and a contention, which would have been tested at the new trial on Count 1 had that count not subsequently been dismissed.

The Hobbs Act counts are hereby dismissed.

ducement, a demand—by the official. In the Sentencing Guidelines and Policy Statements dated April 13, 1987, the Commission explains that the panoply of conduct that may be prosecuted under color of official right "varies *from* a city building inspector who *demands* a small amount of money from the owner of an apartment building to ignore code violations, *to* a state court judge who *extracts* substantial interest-free loans from attorneys who have cases pending in his court...." (emphasis supplied). There is a *victim*. *See* Commentary to Section 2C 1.1 at 2.28.

**12.** The sale to the City made possible the profits obtained. But even if one assumes that Gassaro's profits were in fact obtained from Malouf because Malouf had made Gassaro's investment possible, there is no evidence that the money Gassaro obtained was the result of any "exploitation [by him] of [Malouf's] reasonable belief" that the power of Gassaro's office included the effective authority to assure that the sale went through. *Mazzei*, 521 F.2d at 643, 645. And, of course, there is no evidence that Malouf parted with money because of any belief that Gassaro could or would expedite a favorable outcome or had any intention of doing so, and no evidence that unless Malouf consented to pay, Gassaro could or would become involved in the matter in a manner less likely to produce a favorable result. And, I note, if the "only" in *Hedman,* 630 F.2d at 1195, is the law of this circuit, given the approving quotation in *Jannotti* at 595 of *Hedman*'s statement that "The Government is merely required to prove that a public official obtained money to which he was not entitled and which he obtained *only* because of his official position" (emphasis supplied), there is no evidence of that here. Even if one assumes that Malouf offered the "investment" to Gassaro in part because of the hook that he hoped Gassaro's official position could provide, Gassaro did not obtain profits "only" because of his official position but also obtained those profits because of his life long friendship with Malouf and because of the fact that he, and his father-in-law through him, invested money and invested even more than Malouf. That the evidence disclosed, at best, a combination of reasons for Gassaro's participation is presumably the reason why the government resisted a jury instruction that money was obtained "only" because of his official position.