**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Katherine Bordallo AGUON, et al.,**
**Defendant-Appellant.**

**No. 85–1318.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 12, 1986.

Decided April 2, 1987.

James S. Brooks, Agana, Guam, and Segundo Unpingco, San Jose, Cal., for defendant-appellant.

Paul Verrier, Agana, Guam, for plaintiff-appellee.

Before PREGERSON, POOLE and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Katherine B. Aguon was prosecuted for extortion in violation of the Hobbs Act, 18 U.S.C. § 1951; for conspiracy to commit extortion under 18 U.S.C. § 1951; for mail fraud; and for conspiracy to obstruct justice and for false statements in the grand jury investigation of her conduct. A jury acquitted her of mail fraud and convicted her of the other offenses. We reverse and remand for a new trial.

*Extortion: The Jury Instructions.* Katherine B. Aguon, the defendant, was the Director of the Department of Education (DOE) of Guam between February 1980 and December 1982. A co-defendant was Pyong Hok Han, a Korean businessman, whose company, Hando Enterprises, Inc., was a vendor to DOE. Han testified that he gave Aguon dresses, a washing machine, a gas dryer, a microwave oven, and a refrigerator "to make her happy." He gave them without payment because "like I said, I'm vendor it's to me hard to ask money" and because "I don't want the people don't like my, don't like company to do business with DOE." He testified that he also bought a carpet selected by Aguon in Los Angeles and installed it in her house in Guam. He did this so he would have "no trouble" with his maintenance contract with DOE. Finally, he testified that he also put central air-conditioning in her home. The total value of these offerings was at least $8,500. Aguon was charged under Count Two of the indictment with having "knowingly and wilfully" committed extortion under 18 U.S.C. § 1951 in that she "did obtain and cause to be obtained" these goods, and she was convicted of that crime.[1]

At the beginning of the case before any evidence was introduced, the trial court

1. In relevant part 18 U.S.C. § 1951 reads:
§ 1951 Interference with commerce by threats or violence
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both....
(b) As used in this section
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

read what it characterized as instructions "which go to the essential elements of the criminal conduct that is charged here" in order to give the jury "some feel for the nature of the case." The jury was told that the government had "to prove the case beyond a reasonable doubt." The jury was told that to prove extortion the government would have to prove that the defendant "caused or attempted to cause another to part with money or property by threatening to withhold official action unless he did so." The giving of preliminary instructions was well within the practice permitted by this circuit. *Manual of Model Jury Instructions for the Ninth Circuit* 29 (1985).

The court's instructions to the jury at the close of the case were that the government must prove beyond a reasonable doubt *"three essential elements"* in its case:

First, that the defendant *induced* another under color of official right to part with property.

Second, that she did so by *extortion as defined in these instructions.*

Third, that in doing so, interstate commerce was delayed, interrupted or adversely affected. [Italics supplied]

The court defined "wrongful" as "the obtaining of property by an alleged extortionist to which he has no lawful claim." "Therefore," the court said, proof "that the defendant obtained property under color of official right and that he was not lawfully entitled to this property" was "sufficient to establish that this property was wrongfully obtained by the defendant."

As to "color of official right," the court charged:

This type of extortion *does not* require proof of any specific acts on the part of the public official demonstrating force, threats, use of fear or *inducement.*

The wrongful use of otherwise valid official power converts dutiful action into extortion ...

So *long as the motivation for the payment focuses on* the recipient's office, the conduct falls within the ambit of Section 1951 of Title 18, United States Code. [Italics supplied]

We determine the adequacy of jury instructions by examining them in their entirety. *United States v. Feldman,* 788 F.2d 544, 555 (9th Cir.1986). We review a district court's decision as to particular instructions for abuse of discretion. *Id.*

The instructions in this case were fundamentally flawed. First, in line with the court's "preliminary instructions," they told the jury that the defendant had to "induce" the payment. Then the instructions told the jury that no proof of acts demonstrating "inducement" was necessary. The government now argues that the instruction requiring proof of inducement was more favorable to the defendant than the law required, so she lost nothing in having the instruction canceled by the later instruction. But the instructions are contradictory. The difficulty with contradictory instructions is the confusion they must have generated in the jury. Did it matter whether the payments were induced or not induced? The jury was left without guidance on this question.

The confusion in the court's instructions reflected uncertainty in the law of this circuit. We have construed the Hobbs Act not to require inducement by the government official. *United States v. McClelland,* 731 F.2d 1438, 1440 (9th Cir. 1984), *cert. denied,* 472 U.S. 1010, 105 S.Ct. 2708, 86 L.Ed.2d 723 (1985). The court has observed that the statutory definition of extortion is in the disjunctive: "induced by wrongful use of actual or threatened force, violence, or fear, *or* under color of official right" (emphasis supplied). This construction of the Hobbs Act is concurred in by almost all other circuits. *Id.* at 1439. This court has held that violations of the Hobbs Act "may be proved by demonstrating nothing more than that the payment in question was obtained 'under color of official right.' " *Id.* at 1440.

This court has not, however, spelled out what is meant by "under color of official right." *See, e.g., United States v. Phillips,* 577 F.2d 495, 502 (9th Cir.) (bribery and extortion not necessarily mutually exclusive), *cert. denied,* 439 U.S. 831, 99 S.Ct.

107, 58 L.Ed.2d 125 (1978). This court in *McClelland* did not advert to the ambiguity created when the court said that the payment need not be "induced" but that it must be obtained "under color of official right." According to the standard meaning of the latter phrase, a demand on the grounds of office is required for an act to be under color of official right. No threat and no specific inducement need be made. But a demand (which some people might think to be a form of inducement) is necessary. The confusion and ambiguity of the trial court's instructions fairly reflect the unresolved ambiguity of *McClelland*.

The ancient phase "under color of official right" (the equivalent of *ex colore officii*) had a distinct meaning at common law. It meant "an act badly done under the countenance of an office" under "a dissembling visage of duty." *Dive v. Maningham*, 75 Eng.Rep. 96, 108 (Common Pleas, 1550). Without amplification the phrase is used by Blackstone to define extortion. 4 *Commentaries on the Laws of England* 141 (1765) ("any officer's unlawful taking, by color of his office, from any man, any money or value that is not due to him, or more than is due, or before it is due.").

As applied at common law in the United States the phrase "by or under color of office or official right" was construed to mean that the official made a demand. If money was paid voluntarily, it was not obtained by the officer "by color of his office." *See, e.g., Commonwealth v. Dennie, Thacher's Criminal Cases* 165 (Boston Mun.Ct.1827). "Demand" on the part of the payee, "unwillingness" on the part of the payor, were correlative. The ordinary meaning of "to extort" is "to obtain from an unwilling person." This ordinary meaning was preserved by the interpretation the courts gave to "color of office." *See LaTour v. Stone*, 139 Fla. 681, 190 So. 704 (1939) and the authorities cited therein; *Daniels v. United States*, 17 F.2d 339 (9th Cir.), *cert. denied*, 274 U.S. 744, 47 S.Ct. 591, 71 L.Ed. 1325 (1927).

Some courts insisted that there must be an express request for payment by an official before he could be guilty of extortion.

*E.g., United States v. Harned*, 43 F. 376 (D.Wash.1890). Other courts found demand in a course of conduct that conveyed the official's message to his victim. *E.g., Commonwealth v. Wilson*, 30 Pa.Super. 26 (1906). However subtly the official communicated, a demand was what was necessary to constitute common law extortion. *See* Comment, *"United States v. Mazzei: Hobbs Act Extortion Under Color of Official Right"* 62 Va.L.Rev. 439, 441 (1976) (common law extortion consisted of "corruptly demanding").

Congress has used the terms "extort" or "extortion" in a variety of statutes without any indication of an intention to eliminate the common law requirement of demand. *E.g.* 18 U.S.C. § 875 (transmission with intent to extort); 18 U.S.C. § 876 (mailing with intent to extort); 18 U.S.C. § 872 (extortion by federal officials). This last statute makes it a crime for any officer of the United States "under color of his office" to commit "extortion." As the statute uses a term already contained in the common law meaning of extortion, it has been reasoned that Congress must have meant to require more—the commission of official acts which brought pressure on the one subject to them. *United States v. Sutter*, 160 F.2d 754 (7th Cir.1947). The statute, so interpreted, does not abandon the common law requirement of a demand, but rather, emphasizes its necessity for proof of commission of the crime.

The Supreme Court has analogously interpreted the Travel Act, 18 U.S.C. § 1952, making it a crime to travel in interstate commerce to commit "extortion" in violation of the laws of a state. Elucidating the meaning of the Travel Act, the Supreme Court observed that, at common law, extortion was committed by a public official "under color of office." *United States v. Nardello*, 393 U.S. 286, 289, 89 S.Ct. 534, 536, 21 L.Ed.2d 487 (1969). The Court then held that in the Travel Act Congress intended to reach shakedowns and loansharking by those who were not public officials—acts "which would be generally classified as extortionate." *Id.* at 291–93, 89 S.Ct. at 537–38. Expanding the sense of "extortion," the Court did not eliminate the

core notion that extortion requires a demand.

That the core of the common law meaning of "under color of official right" is preserved by the Hobbs Act cannot be seriously doubted. The Anti-Racketeering Act of 1934 prohibited the wrongful taking of property by force, violence or fear or "under color of official right." 48 Stat. 979. The statute was amended in 1946 by the Hobbs Act, where extortion was defined in terms of these prohibited acts: "the term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Congressman Hobbs said explicitly that the definitions of robbery and extortion were modeled on the New York Penal Code. 91 Cong.Rec. 11,900 (1945). Other congressmen observed that the congressional definitions were in harmony with the understanding of extortion in all of the states, 89 Cong.Rec. 3205 (1943) (statement of Rep. Graham); 91 Cong.Rec. 11,906 (1945) (statement of Rep. Robison). Clearly what was common to all of the states was the core meaning of "under color of official right." When "Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word...." *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952).

Courts are not to create new crimes by changing the accepted meaning. *Id.* If the core common law concept is abandoned, the meaning of extortion becomes uncertain. The statute is "set adrift upon a sea of prosecutorial discretion and becomes unconstitutionally vague." *United States v. Mazzei,* 521 F.2d 639, 655 (3d Cir.) (en banc) (Gibbons, J., dissenting), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). Judge Gibbons' fears were not idle. The Second Circuit was informed by the United States Attorney for the Eastern District of New York in 1983 that the "Hobbs Act may be viewed as enacting a special code of integrity for public officials" although that "as a matter of prosecutorial discretion" ambiguous de minimis conduct by public officials would not be prosecuted. *United States v. O'Grady,* 742 F.2d 682, 684 (2d Cir.1984). As that court pointed out, rejecting this interpretation of the statute, the fact that ambiguous conduct could be prosecuted was alien to basic concepts of criminal justice. *Id.; see also* Comment, *Prosecuting Public Officials Under the Hobbs Act: Inducement as an Element of Extortion Under Color of Official Right,* 52 U.Chi.L.Rev. 1066, 1087 (1985).

The government's construction of the Hobbs Act equates it with the federal statute commonly called "the anti-gratuities statute," 18 U.S.C. § 201(g). Under this statute a federal official who receives money "for or because of any official act performed or to be performed" is subject to imprisonment for two years. Under the Hobbs Act any public official, federal or state, is subject to imprisonment of twenty years. The enactment of the anti-gratuities statute in 1962 was "a clear indication that Congress did not believe that the Hobbs Act prohibits such conduct." *O'Grady,* 742 F.2d at 691. The enactment of the anti-gratuities statute, which deliberately eliminates common law concepts, is also a clear indication that Congress did not intend to eliminate the common law core when in the Hobbs Act it employed the common law phrase "under color of official right."

There has been development under the statute as to proof of demand by an official—a development by modern case law consistent with the common law core. Demand may be proved not by the words of the defendant but by the custom of the system in which the official operates. *E.g., United States v. Kenny,* 462 F.2d 1205 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972) (Gibbons, J.). The Kenny machine, long-entrenched, had established a system whereby "no one could do business" with Jersey City or Hudson County without a kickback, usually 10 percent, of the contract price. At the head of this system was the boss who held no official or party position, yet controlled

everything. In this system, the officeholders did not have to make individual demands for the money. A "thoroughly meshed arrangement" produced the kickbacks for Kenny. *Id.* at 1211. Demand for payment was built in.

Despite the ambiguity of *McClelland,* we there reiterated the essential common law language. We quoted with approval *United States v. Hathaway,* 534 F.2d 386, 393 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), which stated that the statutory language "reflects the common law definition of extortion, which could be committed only by a public official's corrupt taking of a fee *under color of his office* and did not require proof of threat, fear or duress." *McClelland,* 731 F.2d at 1439–40 (emphasis added). We did not abandon the core common law concept. An official may be convicted even though he did not make a threat or an inducement. But under the Hobbs Act as at common law he has to make a demand.

At a verbal level there are differences between the conclusion here and some language of the Second Circuit in *O'Grady,* notably in that court's understanding of "inducement." 742 F.2d at 688. But we are in harmony with *O'Grady* on the main points: That the Hobbs Act punishes a fundamentally different offense than the anti-gratuities statute, *Id.* at 691; that proof of actions under color of office is essential to proof of the crime, *Id.;* and that in short, "this offense requires the jury to find that the public official did something, under color of his office, to cause the giving of benefits." *Id.* at 693.

The government is free to prove that a system was in place in the Department of Education in Guam such that no words were necessary for Aguon to utter to get a payoff. The government did prove at the trial that Granich and Camacho were so regularly paid off by Han that no repetition of demands was necessary by them: a system as to them was in place and at work. But in the case of Aguon, who came into office after Granich and Camacho had embarked on extortion, the evidence of a system of which she was aware was different.

Nevertheless, the government may be able to show that Aguon was part of a system whose customary operation demanded that a share go to the head honcho. The jury must be told that a demand of some kind is to be proved.

The instruction, "So long as the motivation for the payment focuses on the recipient's office, the conduct falls with the orbit of Section 1951 of Title 18" is not erroneous if properly qualified by surrounding language making a correlation between the payor's motivation and the payee's conduct. *See United States v. Scacchetti,* 668 F.2d 643 (2d Cir.), *cert. denied,* 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). No such language qualified the instruction here.

█ The erroneous instructions on inducement and on the motivation of the payor, and the absence of an instruction on demand, were plain error. Their impact was compounded by the trial court's failure to provide guidance on the intention the government must establish. The government on appeal argues that *mens rea* was implicit in the court's use of "wrongful." But the court's own definition of the term negates this argument. The court told the jury that the defendant obtained property wrongfully if it was "obtained under color of official right" and she was "not lawfully entitled to this property." This statement of the elements of the crime was incomplete. Intention was omitted. A homely example will illustrate the deficiency. A judge taking a colleague's robe by mistake does so under color of official right and he is not lawfully entitled to the robe. The taking is wrongful. But it is no crime: the judge acts without *mens rea.*

One searches the instructions on extortion almost in vain for any instructions enlightening the jury on *mens rea.* One finds:

> It is not necessary for the government to show that the defendant actually intended to delay, obstruct or affect interstate commerce.

Thus the jury was told what intention the government need not prove. It was not told what intention the government must

prove. The general instruction that was given, "You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted," has no bearing on the specific intention to commit the crime with which Aguon was charged.

Criminal intent was a necessary element that the government had to prove. No act standing alone is a crime under the Hobbs Act. A guilty mind has to be proved as well as a wrongful deed. In an historic opinion, Justice Jackson, the international prosecutor of the misdeeds of a regime without any respect for individual rights, vindicated this regular requirement of Anglo-American criminal law as "no provincial or transient notion." Invoking William Blackstone, Roscoe Pound and Max Radin, and writing for the Court, Justice Jackson found *mens rea* a cornerstone of our criminal jurisprudence. As he observed, "the intense individualism" of Americans had set this element deep within our criminal law. *Morissette v. United States*, 342 U.S. 246, 250, 251–53, 72 S.Ct. 240, 243, 244–45. Justice Jackson drew the clear corollary: the question of intent must be submitted to the jury. *Id.* at 274, 72 S.Ct. at 255.

■ *A fortiori*, criminal intent must be submitted to the jury in a case charging extortion under the Hobbs Act. "Willful" or "corrupt" were the common law terms focusing on and emphasizing the specific intention the extortionist must be shown to have. *E.g., State v. Pritchard*, 107 N.C. 921, 12 S.E. 50 (1890). As noted above, we have adopted the language of *United States v. Hathaway*, 534 F.2d 386, 393 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), which refers to the common law definition of extortion as a "public official's *corrupt* taking of a fee under color of his office." *United States v. McClelland*, 731 F.2d 1438, 1440 (9th Cir.1984) (emphasis added). The words "corrupt taking" are words of art referring to the mental element in the taking. The corrupt intention must be proved to prove the crime. The court's failure to give an instruction on a vital element of the crime

was plain error. A miscarriage of justice would result if the error was passed over as harmless. *United States v. Young*, 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985).

The confusing instructions on inducement, on motivation, and on color of official right, the lack of an instruction on demand, and the lack of an instruction on specific intent require reversal of Aguon's conviction on Count Two.

Count Three charged Aguon and co-defendants Frank Granich and Ike Camacho with extortion in obtaining and causing to be obtained $42,000 from Kelly Song. Granich was the Supervisor of Buildings and Grounds of DOE. Camacho was the Business Administrator. Song, doing business as K.S. Enterprises, Inc., obtained a contract to paint the JFK school. Granich, confronted by a government tape recording of a conversation between Song and himself, decided to cooperate with the government. He testified that Song paid him $35,000 in cash to get the contract and that he, Granich, gave $15,000 of this amount to Camacho and $5,000 or $7,000 to Aguon.

Granich testified that he gave the $5,000 or $7,000 to Aguon in two cash installments. He characterized the first amount when he gave it to her with these words: "This is a political contribution for you." The second installment he delivered at a political meeting for the re-election of Governor Calvo. At neither time did he tell Aguon that the money came from Song.

No instruction was given the jury on the meaning of "under color of official right." *Mens rea*, which had to be proved if receipt of political contributions was to be converted into extortion, was never set before the jury. Plain error was committed. The conviction on this count must also be reversed.

*Conspiracy to Extort. The Jury Instructions.* Count One charged Aguon, Granich, Han, Song and several other employees of DOE and private contractors with conspiring "to commit extortion" under 18 U.S.C. § 1951. The overt acts in furtherance of the conspiracy alleged to have been committed by Aguon were the

receipt of Han's offerings and the cash from Song.

In the court's "preliminary instructions" before the introduction of evidence, the court explained the elements of conspiracy in terms of the general conspiracy statute, 18 U.S.C. § 371. A jury listening to these instructions would have gathered that Aguon was being tried under the general conspiracy statute not under the much more specific "conspiracy to commit extortion" statute. Despite the language of the indictment, the more general statute was alone the focus.

In the court's final instructions to the jury the court gave an instruction on conspiracy which covered conspiracy to commit extortion under the Hobbs Act, conspiracy to commit mail fraud and conspiracy to obstruct justice. The court declared, "The following instruction on conspiracy applies to both counts." The court then quoted the language of the general conspiracy statute, 18 U.S.C. § 371: "If two or more persons conspire ... to commit any offense against the United States...." The court continued with instructions applicable to the general conspiracy statute.

After about five pages of instruction on the general law of conspiracy, the court said:

> The defendant may be found guilty of the crimes of conspiracy to extort in Count 1, extortion in Count 3, and fraud in Counts 13 and 14, and the conspiracy to obstruct justice in Count 37, even if the defendant personally did not do the acts but aided and abetted in their commission.

The conspiracy instruction also included the instruction that the government must show that the defendant had "wilfully" become a member of the conspiracy. *Mens rea* as to

conspiracy was adequately dealt with by this instruction.

■ At no point in the instruction, however, did the court state that "conspiracy to extort" with which Aguon was charged is a crime under 18 U.S.C. § 1951. The jury was given no inkling of this particular crime. Conspiracy to obstruct justice and conspiracy to commit mail fraud were treated as identical with conspiracy to extort, as though all three crimes of conspiracy were offenses under 18 U.S.C. § 371. The general conspiracy statute, for whose violation Congress has provided a maximum penalty of five years, was not distinguished from the relevant statute, whose violation carries with it a maximum penalty of twenty years. The confusion of the two statutes in the instruction of the court was plain error.

In addition, as the jury had been erroneously instructed on the crime of extortion, there was substantial prejudice to the defendant on the charge of conspiracy to extort—prejudice that spilled over from the instruction on extortion. Believing that it could convict on extortion without corrupt intent, the jury may well have concluded that the extortion Aguon was convicted of under Counts Two and Three was evidence of her participation in the conspiracy under Count One. Facing conviction on three crimes all charged under 18 U.S.C. § 1951, Aguon was entitled to a jury not affected by error as to two of the three Hobbs Act crimes. Viewing the jury instructions as a whole and evaluating the adequacy of the entire charge, *United States v. Frazin*, 780 F.2d 1461, 1468 (9th Cir.1986), we hold that the court committed plain error in the instructions on Counts One, Two and Three. We reverse the conviction on each of these counts.[2]

---

2. We offer the following suggestions as a general guide for a basic Hobbs Act instruction:

> For you to find the defendant guilty of violation of section 1951 of Title 18 of the United States Code—the Hobbs Act—the government must prove the following things beyond a reasonable doubt:
>
> First: that the defendant was a public official.
> Second: that the defendant acted with the intent to obtain from another person money

> or property that the defendant knew she was not entitled to receive.
> Third: that the defendant knowingly caused the person giving the money or property to give it to the defendant.
> Fourth: that the defendant acted under color of official right to obtain the money or property.
> Proof of acting under color of official right must show that the defendant required a pay-

*The Impartiality of the Jury.* Aguon moved for a new trial because of a lack of an impartial jury and now appeals the denial of that motion. Her appeal has merit. Robert San Nicholas, a juror in the case, pleaded guilty on October 3, 1985 to a charge of taking kickbacks in connection with the letting of paving contracts. The charge to which he pleaded was a misdemeanor, a crime against the local laws of Guam, not a federal felony. Federal judge, federal prosecutor and defense counsel were all unaware that, when San Nicholas sat as a juror in Aguon's trial in August 1985, he himself was guilty of a crime whose essential features were similar to those of the main charge against Aguon.

 The presence of even a single partial juror violates a defendant's right under the Sixth Amendment to trial by an impartial jury. Prejudice exists in a juror who is open to prosecution for an offense similar to that for which the defendant is on trial. *United States v. Eubanks,* 591 F.2d 513, 516 (9th Cir.1979). The juror may wish to acquit someone circumstanced like himself; or the juror may want to show his rectitude by bending in the government's direction. Certainly if San Nicholas had revealed the fact of the impending criminal proceedings on voir dire, one or both parties would have moved to disqualify him for cause.

The bias created by impending criminal proceedings is too great to permit a presumption of impartiality when the crime of the juror is fresh enough to be open to punishment and like enough to the crime before him to prompt emotions of empathy and fear of like legal retribution. If Aguon was liable to conviction under the Hobbs Act, then so San Nicholas must have seen, was he.

Disqualification of a juror turns on particular facts. No case is cited to us on all fours with this one. Several are suggestive: In *Eubanks,* 591 F.2d at 516, the emotional impact of two of a juror's sons

serving sentences for heroin-related cases disqualified the juror from sitting on a case against a dealer in heroin. In *United States v. Perkins,* 748 F.2d 1519, 1532 (11th Cir.1984), a juror was silent when the jury was asked if any member had been involved in prior criminal or civil litigation. In fact he had been a civil defendant and a witness in a criminal trial. His silence was construed as intentional misrepresentation. In *United States v. McCorkle,* 248 F.2d 1 (3rd Cir.), *cert. denied* 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed. 77 (1957), a juror who had been robbed seven months previous to the trial was found disqualified to sit on a robbery trial. Another juror had been questioned at the voir dire about his robbery experience, but not this juror. The court said: "The assurance of an impartial tribunal is too vital to be subjected to speculation concerning the quantum of prejudice flowing from this grossly disqualified juror." 248 F.2d at 8. In habeas corpus proceedings the court required the state to give the defendant a new trial.

San Nicholas was not asked if he was under investigation, but the jury as a group was asked the general question if any member knew of any reason why he or she might not be able to be fair. Failure to answer yes to that question was as much intentional concealment as the silence of the juror in *Perkins, supra.* To be sure, to have explained his prejudice would have involved San Nicholas in self-incrimination, but he could have invoked his privilege under the Fifth Amendment. Embarrassment at doing so did not excuse him from speaking up. *United States v. Bynum,* 634 F.2d 768, 771 (4th Cir.1980).

San Nicholas' disqualification arose from the similarity between his crime and the principal crime for which Aguon was being tried. But the effect of his disqualification extends to all the counts on which Aguon was tried. A juror prejudiced on the main

off from another person for the use or nonuse of her official power.
Proof that the defendant required the payoff for the use or nonuse of her official power may be made in several ways: by her express words to the payor; or by her conduct communicating a message to the payor that a payoff was expected; or by her participation in a system that she knew communicated the message to the payor that a payoff was expected.

charges could not be expected to be neutral on the lesser ones; San Nicholas should not be thought of as having two minds, one capable of impartiality, the other biased.

 A post-trial hearing brought to light these grounds, which cast serious doubt on the impartiality of juror San Nicholas and, consequently, the fairness of the trial. A trial judge has broad discretion in considering claims of juror misconduct, *see United States v. Hendrix*, 549 F.2d 1225 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). In these circumstances, that discretion was abused. The convictions cannot stand.

### Other Issues

We do not find merit in the other issues raised by Aguon but for guidance in the event of a new trial we rule on them.

The Fourth Amendment, Aguon contends, was violated when two federal agents interviewed her. The meeting was in her office. It was held by appointment. This is no indication that she was not free to leave any time she wished. Aguon was not seized.

Aguon also urges that Granich, acting as a government agent, entrapped her into the conspiracy to obstruct justice. Concealment by her of her unauthorized access to the draft audit report alone suffices to bar any finding of entrapment as a matter of law. *United States v. Chen*, 754 F.2d 817, 821 (9th Cir.), *cert. denied*, 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). Moreover, the question of entrapment was properly submitted to the jury, which failed to accept this defense.

Alternatively, Aguon argues that the government's use of Granich denied her due process. Granich played the ignominious role of a tempter who led Aguon on, but his protracted part as a "wired" informant was not "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Bogart*, 783 F.2d 1428, 1432 (9th Cir.1986); *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir.1976), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977); *United States v. Bagnariol*, 665 F.2d 877, 883

(9th Cir.1981), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

Aguon objects to references by the prosecuting attorney to her political activity. On direct examination Aguon herself had discussed her political activity at length. Her political involvement was germane to her defense. Considering the effect of the prosecutor's remarks in the context of the entire trial, *United States v. Patel*, 762 F.2d 784, 795 (9th Cir.1985), and in light of similar remarks made on the defendant's behalf, *see United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), we find that those remarks did not deprive Aguon of a fair trial. The same conclusion must be reached as to the prosecution's reference to the guilty pleas of her co-defendants. The closing argument of Aguon also mentioned these pleas. The prosecution's reference did not deprive her of a fair trial. *Id.*

Aguon complains of the court's exclusion of her expert on psycholinguistics, who would have testified about the taped conversations with Granich. While such testimony might have assisted the trier of fact, Fed.R.Evid. 702, the trial court has broad discretion to admit or exclude expert testimony. *United States v. Gann*, 732 F.2d 714 (9th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984). We have repeatedly upheld the exclusion of psycholinguistic expert testimony, *United States v. Hearst*, 563 F.2d 1331, 1349–50 (9th Cir.1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); *United States v. Schmidt*, 711 F.2d 595, 599 (5th Cir.1983), *cert. denied*, 464 U.S. 1041, 104 S.Ct. 705, 79 L.Ed.2d 169 (1984); *United States v. Kupau*, 781 F.2d 740, 745 (9th Cir.1986). There was no abuse of discretion by the trial court in excluding the proffered testimony.

The defendant claims that three other jurors besides San Nicholas were biased against her. No significant bias appears. Juror Buentipo was unaware that his cousin's wife had been fired by the defendant's family. Juror Borja was no longer the niece by marriage of prosecution witness

Frank Granich; Granich had divorced her aunt. Juror White, as she explained at voir dire, was a friend of one of the co-defendants, Pazita Camacho, but Camacho was not on trial, having pled guilty. The acceptance of these jurors was well within the court's discretion. *United States v. Hendrix*, 549 F.2d 1225 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977).

The defendant observes that the court violated Rule 24 of the Federal Rules of Criminal Procedure by not designating which two of the fourteen jurors were alternates until the start of deliberations, when the "additional" jurors were duly discharged. Absent the consent of the parties, we discourage this unauthorized deviation from standard procedure, *see United States v. Viserto*, 596 F.2d 531 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); but the defendant has presented no scenario in which this procedure could have prejudiced her. The court's error was harmless. Fed.R.Crim.P. 2, 52(a); *see United States v. Phillips*, 664 F.2d 971, 992–93 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

Aguon also finds objectionable the court's transmission to the jury of a list of the exhibits taken into the jury room. This ministerial act, to which counsel raised no objection beforehand, posed an insignificant risk of prejudice compared to direct, substantive communication between judge and jury, *see United States v. United States Gypsum Co.*, 438 U.S. 422, 460, 98 S.Ct. 2864, 2885, 57 L.Ed.2d 854 (1977); *United States v. Artus*, 591 F.2d 526 (9th Cir.1979). In these circumstances, no formal hearing was warranted. *United States v. Diggs*, 522 F.2d 1310 (D.C.Cir. 1975), *cert. denied*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976).

A broader argument by the defendant is that the conduct of her trial counsel deprived her of the effective assistance of counsel, in violation of the Sixth Amendment. Specifically Aguon argues that trial counsel should have raised several of the objections disposed of above, sought a change of venue, and moved for dismissal on grounds of selective prosecution. The defendant must rebut "the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ..." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). Our disposition of the various objections above suggests that the failure to raise them was not prejudicial. As for change of venue, the trial judge did discuss with counsel the issue of pretrial publicity, but counsel for the defendant, *after consulting with her*, stipulated that the jury was satisfactory. The effectiveness of trial counsel must be evaluated in light of the client's conduct. *Id.* at 691, 104 S.Ct. at 2066. A selective-prosecution claim would appear to have had little chance for success, as defendant would have had to show both discriminatory purpose and discriminatory effect to establish a violation of equal protection. *Wayte v. United States*, 470 U.S. 598, 607–08, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

Aguon had able representation. Her counsel's conduct was far from preventing "the proper functioning of the adversarial process...." *Strickland, supra*, 466 U.S. at 686, 104 S.Ct. at 2064. In fact, as a result of her counsel's development of her defense at the trial and post-trial hearing, as well as thanks to the efforts of her different counsel on appeal, Aguon is entitled to a new trial.

REVERSED AND REMANDED.

POOLE, Circuit Judge, dissenting:

I must respectfully dissent.

Although the law of this circuit construing the Hobbs Act, 18 U.S.C. § 1951(b)(2), unambiguously holds that when a public official, "under color of official right," obtains property or money to which she is not entitled, no showing of "inducement" is required, *United States v. McClelland*, 731 F.2d 1438, 1440 (9th Cir.1984), the majority in this case has reached a contrary result, holding that there must be a substantial equivalent of inducement, a "demand" by the recipient, in order to make out the

offense. This constitutes a rejection of the rule of this circuit and of every other circuit but one. By purporting to "distinguish" the above authorities, the majority has in fact overruled our circuit law.

In my judgment the majority is in error both as to the elements of extortion, and in disregarding our circuit rules regulating how we go about changing our law.

## I.

The defendant, Katherine Bordallo Aguon, one-time Director of the Department of Education of Guam, was convicted by a jury of extortion under the Hobbs Act, conspiracy to obstruct justice, 18 U.S.C. § 371, and of making false declarations to the United States Grand Jury. On this appeal, the majority has reversed all convictions. The formulation of an incorrect legal principle has caused the majority to strike down all verdicts and judgments and to topple the entire trial like a stack of dominoes.

### Majority's Reason for Reversal

Before opening statements or any evidence had been offered, and in an attempt to give the jury some "feel" of the case, the trial judge discussed extortion under the Hobbs Act. Initially he told the jury there had to be proof that the defendant "induced another under color of official right to part with property." That was incorrect. The Hobbs Act deals with interference with commerce—a term of art—when done or attempted by robbery, extortion, violence or threats thereof. Section 1951(b)(1) defines "robbery" as used in the Act. Section 1951(b)(2) defines "extortion" in these words: "(2) [t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." As set forth more fully below, the statutory definitions differentiate between extortion consisting of the obtaining of property from another, with his consent, "induced by wrongful use of actual or threatened force, violence, or fear," from extortion "under color of official right." This last

phrase is disjunctively placed in the definition. The word, "induced," refers to the "consent" brought about by force or fear.

This is the reading which we adopted in *United States v. McClelland*. Therefore, the initial instruction of the trial judge was incorrect. However, the misstatement was immediately corrected by an instruction that "extortion [under color of official right] *does not* require inducement," and that "the wrongful use of otherwise valid official power converts dutiful action into extortion."

The majority held that this conflict in instruction created such confusion in the minds of the jury that it was reversible error. This conclusion has no warrant. The first remarks would have imposed upon the government proof of an element not at all required. The jury might well have thought the government had a greater burden than it really had. Nonetheless it found that the defendant committed the offense. Thus, there could be no prejudice to the defendant; the potential harm, if any, was to the government's case.

The majority further complains that the instructions failed to tell the jury that the charge of conspiracy was invalid unless its object was to commit some kind of extortion involving "inducement"—that conspiracy under color of official right was conspiracy of a different breed than general conspiracy. Further, the majority said that the trial judge inadequately defined criminal intent, or mens rea, since he made no distinction between the obtaining of property "under color of official right" and the receipt of legitimate political contributions. Again, the majority erroneously has held that there must be inducement. The majority ended up drafting for trial judges, somewhat presumptuously, in my view, its version of "model" instructions for their use in future case. These instructions are wrong and experienced trial judges are unlikely to accept them.

Finally, the majority held that a juror who, two months after trial, pleaded guilty to a misdemeanor charge under the laws of Guam, and who was asked no question which fairly required him to answer that

such charge was pending, was nonetheless disqualified as a matter of law, and that his presence on the jury was another ground for reversal. Again, the majority links the claimed juror disqualification to its general premise that the case was already so fatally flawed by the trial court's treatment that reversal was mandated.

### The Evidence

Co-defendant Pyong Hok Han, a Korean citizen, was principal of a company, Hando Enterprises, which was engaged actively in selling supplies to the department of which Aguon was Director. He testified that over a substantial period of time he gave Aguon numerous things of value, including clothing, a washer, a gas dryer, a microwave oven, a refrigerator and other household goods. He did so "to make her happy," and because "I don't want the people don't like my, don't like company to do business with DOE." He paid for a carpet which Aguon herself selected in Los Angeles and arranged for its shipment and installation in her house in Guam so that he would have "no trouble" with his maintenance contract with the Department. His testimony makes clear that Han gave these gifts to Aguon to insure her assistance, which was necessary if he was to maintain his contracts with the Department. There was absolutely no other relationship between them to explain any reason for the valuable gratuities, and the jury could reasonably find that Aguon consciously exploited Han's anxiety about her continued help and willingly accepted the valuables from him. Whether Aguon *initiated* the arrangement with Han, (that is affirmatively and demonstrably "induced" or solicited the gifts) is logically irrelevant, so long as she, a public officer, knowingly accepted the things of value from a contractor with her department and, indeed, participated in implementing the bargain. *See also United States v. Hathaway*, 534 F.2d 386 (1st Cir.1976). (Although the government's witness [Graham] himself may have first brought up the subject of payments, " * * * the jury could find that the impetus came from a reasonable apprehension that, without paying, [his company] would not be considered [for a contract award] by the Authority. [Appellant's] exploitation of such a fear amounted to extortion notwithstanding Graham's readiness and even eagerness to play the game.") (citations omitted). *Hathaway*, 534 F.2d at 395; *United States v. Gates*, 616 F.2d 1103, 1105 (9th Cir.1980). Any public official knows that gratuities from one beholden to the official are not simply those of a moonstruck swain, but of one seeking official favor.

In another count, Aguon, Frank Granich (Supervisor of Buildings and Grounds for the Department), and Camacho (Business Administrator) were charged with obtaining $42,000 from Kelly Song who had painting contracts with the Department. Granich testified that Song gave him $35,000 for getting the contract, and that he gave $5,000 or $7,000 to Aguon in two payments. He said he told her, at the time of the first payment, "this is a political contribution for you." But there was other evidence in the record, including statements made by Aguon, Camacho and Granich during the investigation and surreptitiously recorded, from which the jury could infer that Aguon knew that the donor of this cash was a contractor. The recorded conversations showed those three trying to get their stories together for the grand jury, and that Aguon was engaged in concealing her knowledge of the identity of the donors and of the connection of the gifts to their contractual positions.

The majority attacks the value of this evidence, suggesting that only ordinary political contributions were involved and so there could be no extortion without "mens rea," again, meaning without evidence of inducement. That is wrong; the jury could indeed find criminal intent based on Han's statements to Aguon as she took the valuable "gifts." Moreover, the jury received strong inferences of guilty knowledge in Aguon's recorded conversations with Camacho and Granich. The existence of a guilty state of mind was certainly a question for the jury considering the recorded conversations of these officials trying to find explanations to give to a grand jury for their custom and pattern of taking ex-

pensive items and large sums in cash from contractors doing business with their Department. The trial jury could reasonably conclude that the officials had guilty minds.

The majority opinion has not explicitly held the evidence to be insufficient to justify the jury's findings of guilty knowledge and intent; rather it complains of the failure to instruct the jury that the element of mens rea required showing that the defendant induced the turning over of the money and property. The court gave the standard instructions on knowledge and wilfulness. Under those instructions, the jury could find that Aguon understood that these gratuities were intended as incentives to assure continued favors of her official position, and, understanding, took them again and again.

The majority's reversal of the verdicts is simply the product of its incorrect representation of the law of *this* circuit.

### Ninth Circuit Law

No single panel of this court is free to reject the authority of *United States v. McClelland*, 731 F.2d 1438 (9th Cir.1984). In that case, the trial judge had instructed the jury that "it is not necessary for the Government to show that the defendant induced the extortionate payment." On appeal after conviction, the defendant challenged the instruction, arguing, as does the majority here, that the Government had to prove that the defendant acted in some manner to "induce" the payment in question. We disagreed and said:

Every circuit which has considered whether inducement is an essential element of a section 1951 violation has ruled that is not. *See e.g., United States v. Jannotti*, 673 F.2d 578, 594–96 (3d Cir. 1982) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Butler*, 618 F.2d 411, 417–20 (6th Cir.), *cert. denied*, 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980); *United States v. Hall*, 536 F.2d 313, 320–21 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *United States v. Hathaway*, 534

F.2d 386, 393 (1st Cir.) *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Braasch*, 505 F.2d 139, 151 n. 8 (7th Cir.1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

The statute is clearly phrased in the disjunctive: "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, *or* under color of official right." § 1951(b)(2) (Emphasis supplied). Further, a disjunctive reading comports with the historical development of the crime of extortion. The "under color of official right" language reflects the common law definition of extortion, which could be committed only by a public official's corrupt taking of a fee under color of his office and did not require proof of threat, fear, or duress * * * * The misuse of public office is said to supply the element of coercion * * * * Threats, fear and duress became express elements only when the crime was later broadened to include actions by private individuals, who had no official power to wield over their victims.

*Hathaway*, 534 F.2d at 393. Thus, we hold that where the defendant is a public official, the government need not show inducement and extortion may be proved by demonstrating nothing more than that the payment in question was obtained "under color of official right."

*McClelland*, 731 F.2d at 1439–40 (footnote omitted).

The statutory definition of extortion supports *McClelland*:

(2) "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. 18 U.S.C. § 1951(b)(2). Correctly read, the statute is in the disjunctive, thus:

"The term 'extortion means the obtaining of property from another, with his consent,

(i) induced by wrongful use of actual or threatened force, violence, or fear, or

(ii) under color of official right.

The source of the majority's confusion, the trigger responsible for its departure from the authority of this circuit, is its confusion about the proper application of the word "induced" in the definition of "extortion" in section 1951(b)(2). My Random House College Dictionary, Revised Edition, 1979, puts it this way:

*Induce* v.t., *-duced.* 1. to influence or persuade, as to some action, state of mind, etc.; Induce him to stay.
2. to bring about or cause; sleep induced by drugs. *Syn. 1.* actuate, prompt, incite, urge, spur. See *persuade. Ant. 1.* dissuade.

Apparently convinced that a "better rule" was that of a Second Circuit decision and a Third Circuit Dissent, the majority reads "induced" as referring to some invitation by the official under his color of official right, that is, that the official affirmatively or overtly does something to "bring about or cause" the offer of gratuity. Not so. "Induced" qualifies and refers to words which follow it—"by wrongful use of actual or threatened force, violence or fear." The word "induced" does not relate to the clause following the word "fear."

There is an obvious conceptual difference between extortion (which I have set up as a subordinate subsection (i)) and that in my supposed subsection (ii). All extortion involves property "obtained with consent;" analytically that is what differentiates extortion from "robbery" set forth in 18 U.S.C. § 1951(b). But in subsection (b) "(i)" the "consent" comes about because of, is "induced" by, the "wrongful use of [actual or threatened] force, violence or fear." "Consent" in the latter situation requires the extortionist (or someone on his behalf) to *do* something affirmatively to instill in the donor the state of mind wherein he ostensibly "consents." The "consent" is the yielding to the compulsion of force, etc., to avoid physical or other harm. The hope of avoiding that harm "induces" the victim to yield.

But in my subsection (b) "(2)"—extortion "under color of official right"—the donor's "consent" to give to the official is real,

unfeigned. All the recipient-official has to do is to be willing to take, knowing the donor's expectation; that is shown by his taking, and pocketing, with a reasonable understanding that the deal implicates official action. What "bring[s] about or cause[s]" the donor's disposing mind is his hope to keep or get what the official has to give or deny. Therefore, in extortion under color of official right, the donor's conduct is truly "voluntary," unlike that "induced by" threat or fear. Extortion by force or fear assaults the individual; that accomplished under color of official right assaults the public office and the public trust. The element of "inducement" is essential to convert a seeming consensual delivery of property into a crime; it is not needed to make criminal the obtaining of property by a public official who knows that it is consideration for exercise of his official duty.

Other circuits agree. In the Hobbs Act case of *United States v. Jannotti*, 673 F.2d 578, 594 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), defendants argued that they had only "passive[ly]" accepted gratuities. But the Third Circuit explained that extortion under "[c]olor of official right is defined as the *taking* by a public official of money not due him or his office." 673 F.2d 578, 595. (Emphasis supplied.) The court held that "the Hobbs Act covers the acceptance of bribes by public officials * * * and the further suggestion that there need be no inducement or prior request for such payments accords with the view taken by the other courts of appeals." *Id.*

Similarly, in *United States v. Hedman*, 630 F.2d 1184 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981), the court explicitly rejected the argument that the government must show that the officials were the "initiators" or "inducers" of the payments, holding that "in a Hobbs Act prosecution for extortion under color of official right it is unnecessary to show that the defendant induced the extortionate payment * * * * The government is merely required to prove that a public official obtained money to

which he was not entitled and which he obtained only because of his official position." *Id.* at 1195. And in *United States v. Scacchetti,* 668 F.2d 643, 647 (2d Cir. 1982), the court said:

> So long as the motivation for the payment focuses on the office of the recipient, the conduct falls within the ambit of the Hobbs Act.

Properly understood, the statute does not contemplate that an official have initiated the transaction or have made a demand. What is required is that the official have willingly exploited the donor's understanding that giving something of value will influence official action. That is the true vice of official extortion. *See also United States v. Hall,* 536 F.2d 313, 320 (10th Cir.1976).

### *"Ambiguity" in United States v. McClelland*

The majority suggests that *McClelland* is of questionable authority because of a "weakness" in that opinion; that is that neither *McClelland* nor other authority of this circuit "has * * * spelled out what is meant by the term, 'under color of official right,'" and that "*McClelland* did not advert to the ambiguity created when the court said that the payment had not been 'induced' but that it must be obtained 'under color of official right.'" Maj.Op. at 1416. In view of this perceived invalidity, the majority has felt free to set forth its own restatement of the law:

> According to the standard meaning of the latter phrase, a demand on the grounds of office is required for an act to be under color of official right. No threat and no specific inducement need be made. But a demand (which some people might think to be a form of inducement) is necessary. The confusion and ambiguity of the trial court's instructions fairly reflect the *unresolved ambiguity* of *McClelland*.

Maj.Op. at 1416. (Emphasis supplied.)

Thus revealed, the majority opinion has embarked on a didactic cruise in time, culling bits of historic lore, unraveling mysteries of the common law heretofore uncollat-

ed. Completely forgetting, or whimsically oblivious of the force of circuit precedent, the majority's voyage has ranged over the English Reports of Common Pleas (1550), and through selective commentaries of Blackstone (1765), garnering rare gems of the Boston Municipal Court Reports (1827) eventually to come to rest on the rock-ribbed anchorage of a law review assertion that "common law extortion consisted of 'corruptly *demanding* '". (Emphasis supplied.) Inspired by its excursion through history, the majority opinion bestows its new-found wisdom, telling us that, since extortion required a demand at common law, and since Congress is not shown to have eliminated the common law requirement, that element must still be part of section 1951(b)(2). For further support, the majority cites to Judge Gibbons' *dissent* in *United States v. Mazzei,* 521 F.2d 639 (3d Cir.) (en banc) (Gibbons, J., dissenting), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). In *Mazzei,* the Third Circuit, en banc, held that where the defendant acted under color of official right, any "coercion" is supplied by the misuse of official power, but that no coercive use of office need be proved. Judge Gibbons, however, reaching back into the common law to justify a narrow construction of section 1951, complained that were the "common law core" concept to be abandoned, the statute would be "set * * * adrift upon a sea of prosecutorial discretion" and become unconstitutionally vague. *Mazzei,* 521 F.2d at 655 (Gibbons, J. dissenting), cited in Maj.Op. at 1417. Enthusiastically, the majority adopts Judge Gibbons' rejected analysis.

The majority contends that the *McClelland-Hathaway* rules in effect equate section 1951 with the federal bribery of public officials statutes, particularly 18 U.S.C. § 201(g), punishing a public official who "directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him." Violations of section 201(g) are punishable by fines up to $10,000 and imprisonment up to two years, or both. By enacting this

statute in 1962, the majority says (endorsing some of the Second Circuit's several opinions in *United States v. O'Grady*, 742 F.2d 682, 691 (2d Cir.1984), that Congress gave a "clear indication" that it did not believe that the Hobbs Act already reached the same conduct and "that Congress did not intend to eliminate the common law core [i.e., necessity for a 'demand'] when, in the Hobbs Act, it employed the common law phrase 'under color of official right.'" Maj.Op. at 1417. The Second Circuit appears to be alone in this position. In fact, Congress could, and often has, enacted several discrete statutory treatments of related conduct. We are not really engaged in some abstract teaching of the "better view." We are bound by standing circuit precedent. A decent appreciation of our rule is sometimes hard to accept; but that is our commitment.

Thus, the majority has rejected standing precedent, declaring that henceforth the new law of this circuit will be that "this offense requires the jury to find that the public official did something, under color of his office, to cause the giving of benefits." Maj.Op. at 1418 (*quoting O'Grady*, 742 F.2d at 693). The majority seems unconcerned that *O'Grady* is (1) a minority view, and (2) that the dissent of Judge Gibbons is the law of neither the Third nor of the Ninth Circuit.

The claim that *McClelland* is "ambiguous" in that it did not enlarge upon the term "under color of official right," is an unacceptable reason for attempting to rewrite its holding. The facts of *McClelland* are not ambiguous. The appellant, a city councilman, was approached by an undercover agent who claimed to be representative of a fictitious organization of doctors interested in investments. After a number of meetings and discussions, in consideration for his promised vote of approval for construction of a bank in which the payors were interested, the defendant accepted a check written to a corporation which he owned. *United States v. McClelland*, 571 F.Supp. 759, 770 (D.Nev.1983), *affirmed* 731 F.2d 1438 (9th Cir.1984). There was no coercive demand, not even the most subtle. But the statute was held violated.

Whether or not extortion usually connoted some form of "demand" at common law, we and most other courts have already clearly said that the common law element of demand forms no part of the Hobbs Act prohibition involving extortion "under color of official right." We are not free, as may be the writers of scholarly notes, to say otherwise. Only the Supreme Court, or this court en banc, may create new law. Nor may such precedential authority be eroded by the device of "distinguishing" or "reinterpreting," by a panel which believes it has devised a "better view," or has reached a sounder historical view of "original intent."

### "Confusion" in the Jury Instructions

Because our circuit law is clear, there was no fatal "confusion" in jury instructions as the majority asserts. The majority asks "[d]id it matter whether the payments were induced or not induced?" The short answer here is "no." Since no inducement was required, any "confusion" in the jury's minds could only have been whether the government had a higher burden of proof than it really did; that could only have benefited Aguon. A jury trial is not a game of technicalities where each foot fault may lose the point. The claimed error would "logically [be] harmless to defendant beyond any reasonable doubt." *United States v. Rea*, 532 F.2d 147, 149 (9th Cir.1976). *See also* Fed.R.Crim.P. 52(a).

Equally without merit is the further contention that the lack of an explicit instruction on *mens rea* compounded some plain error in the jury instructions. The majority's real argument is that an essential element of the offense is a demand, without which there is no criminal intent. Although the trial court did not specify any particular requirement of criminal intent in its instructions, that interest was nevertheless clearly implicit in the advice to the jury.

Aguon was charged with having "knowingly and wilfully" committed extortion under color of official right. The court did

give sufficient instructions on the meaning of "knowingly." The court instructed on the meaning of these terms. The majority itself agrees that the terms "knowingly" and "wilfully" adequately convey the sense of *mens rea* in a charge of conspiracy. What those terms do not tell the triers of fact is that there must be some inducement. Nor need they do so.

The majority reversed the conviction of conspiracy in count 3 because it held that *mens rea,* meaning inducement, had to be proved if the receipt of political contributions is charged as extortion. In defining "under color of official right," the court instructed that the "wrongful use of otherwise valid official power converts dutiful action into extortion * * *," and that extortion under color of official right was "the wrongful taking by a public officer of money or property not due him or his office." (RT 1270). The use of the term "wrongful" in both instances, in the context of this case, was adequate to advise the jury of the only intent requirement—the intent to take money or property under color of official right. *See United States v. Scacchetti,* 668 F.2d 643, 649 (2nd Cir.1982). Of course, it is not "wrongful" to accept campaign contributions where the donee has no reason to understand that the donor is giving in order to influence action (or inaction) by the official. The majority's *"homely* example" in which one judge mistakenly picks up another's robe is fanciful.

With respect to the conspiracy charge of count 1, the majority is simply confused. Conspiracy can be understood simply as an agreement to commit an unlawful act. Without doubt, the statements and demeanor of the defendants, particularly as revealed in the testimony and on the tape recordings, show that they fully understood that the contractors were "buying" official action. Nor is the fact that different sentence maxima may apply for conviction of conspiracy to commit two different crimes relevant to the jury's understanding of the issues.

### Jury Prejudice

The Aguon jury of which San Nicholas was a member returned its verdict in Au-

gust 1985. On October 3, 1985 San Nicholas pleaded guilty to a Guam (not federal) misdemeanor of taking kickbacks in connection with paving contracts. On this *voir dire* he did not volunteer that such charges were pending. The majority contends that he was bound to volunteer that information and that his failure to do so violated Aguon's Sixth Amendment right to trial by an impartial jury. I find this a make-weight argument.

In *McDonough Power Equipment Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) the Supreme Court considered when a juror's response or failure of response at *voir dire* rises to constitutional prejudice and necessitates a new trial. A *McDonough* juror gave a "mistaken though honest response" to a question on *voir dire,* and that omission was held not enough to invalidate the verdict in a products liability action. To be entitled to a new trial, the Court ruled a party must "first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a *challenge for cause." Id.* at 556, 104 S.Ct. at 850. (Emphasis supplied.)

The first prong of this test is absent here. San Nicholas was *not* asked if he was under investigation or if he had ever been under investigation. Nor was he asked whether he had ever been involved in a situation like this case, or was related to anyone who had been. The jury was asked only the general question whether anyone knew of any reason why he or she might not be able to be fair to both sides. Giving the fullest significance to this very general question, nothing indicates probable bias by San Nicholas against Aguon. There was nothing dishonest in San Nicholas' silence when no response was called for, and the "silence" does not conceal animus. Of course the prosecution or the defense might have exercised a peremptory challenge had they been informed of his activities. We do not know that Aguon would have done so. Except insofar as pending charges might be adversarial to the *prose-*

*cution*, no basis for challenge *for cause* is implicated.

There is no evidence of prejudice against Aguon. The majority attempts a challenge based on no record whatsoever, except that San Nicholas joined in the verdict. Had he been asked the relevant question and answered incorrectly, bias would be established—also probably contempt of court. But the purpose of juror *voir dire* is to determine the existence of bias which supports a challenge for cause; its purpose is not to elicit answers which might form a basis for a peremptory challenge. To the questions actually asked of San Nicholas on *voir dire*, his answers were neither incorrect or incomplete. This issue has no merit. It is not to be presumed that anyone who has been charged with a crime is probably disposed to vote to convict a defendant.

*United States v. Perkins*, 748 F.2d 1519 (11th Cir.1984), cited by the majority, is inapposite. In that case, the suspect juror was specifically asked on *voir dire* whether he knew the defendant and whether he had been involved in prior civil or criminal litigation. He answered "no" to both questions. It turned out, as the result of a post-trial hearing, that the juror's answers were wrong: he had served on a committee *with the defendant*. He had been involved as a civil defendant charged with misappropriation of Union funds; and he had "testified as a Government witness in [another case] and his credibility [in the latter case had been] impeached by two character witnesses. Yet [he] claimed that he forgot about both of the cases during *voir dire*." *Perkins*, 748 F.2d at 1530. The court con-

cluded from the surrounding facts that although the answers were not, in their entirety, intentionally false, the intentional concealment justified an inference of bias. The court relied most heavily on the juror's *dishonest* answer as "strong indication that he was not impartial," *Id.* at 1532. The answers of juror San Nicholas to the questions put to him here provide no basis for a finding of intentional concealment or of any inference of bias. The majority's rational rests on thin air.

Nor does *United States v. Eubanks*, 591 F.2d 513 (9th Cir.1979) (per curiam) help the majority. It is incorrectly cited as authority that "[p]rejudice exists in a juror who is open to prosecution for an offense similar to that for which the defendant is on trial." That case involved a conspiracy to distribute and to possess heroin. Juror Collins had indicated on a juror qualification form that he had no children. At *voir dire* examination the judge asked if he or any members of his immediate family had ever been "personally interested in the defense of a criminal case or a witness for the defense in a criminal case." Collins did not respond. In fact, Collins had two sons, both of whom were heroin users and were serving long prison terms for heroin-related crimes of murder and robbery. We remanded on the premise that his sons' "tragic involvement with heroin bars the inference that Collins served as an impartial juror" and that bias may be presumed from the "potential for substantial emotional involvement" inherent in certain relationships. *Id.* 591 F.2d at 517, citing *United States v. Allsup*, 566 F.2d 68, 71–72 (9th Cir.1977).[1]

1. This court expanded on the situation in two footnotes:

(1) It is ironic that the only question juror Collins responded to during voir dire was the following: "Have any members of the panel during their current jury service or during any prior service had occasion to serve in any case involving drug or narcotic offenses?" Collins responded, "I was on a case here a couple of months ago for narcotics, but it wouldn't affect me." The judge replied: "Thank you, sir," and did not pursue the inquiry.

(2) The problem with juror Collins might have been avoided had the trial judge permitted a more extensive voir dire. Among the additional

voir dire questions posed by the defense was Question 22: "Does any member of the panel have any friends or relatives who have been involved with heroin? If so, would the fact prevent anyone from rendering a fair and impartial verdict?" The trial judge refused to ask prospective jurors this question.

The hazards of the trial court's reluctance to permit additional voir dire became apparent at trial. On the second day of the trial, the Government moved to strike juror Edward Sharrar, Jr. from the jury panel, after it was learned that he had a son awaiting trial on a federal criminal charge. Sharrar, who had not

The majority has not established that juror San Nicholas' subsequent plea of guilty to a misdemeanor of a state crime justified any presumption against his impartiality. We accord the trial judge broad discretion in considering claims of juror misconduct precisely because he is in the best position to determine their effect on the outcome of a trial. The attempt here to establish a fixed presumption that one charged with a crime similar to that in which he is summonsed as juror is necessarily hostile to the defendant is unfounded.

In sum, the majority's misinterpretation of circuit law, and its efforts to tailor many subordinate issues to its fundamentally flawed vision, has led to an incorrect decision and cannot stand. I would reject the majority's departure from governing precedent, and would affirm the convictions.

revealed this information during voir dire, was replaced by one of the alternate jurors.